# STATE OF MICHIGAN

# COURT OF APPEALS

GREGORY JOHNSON,

        Plaintiff/Counter-Defendant-
        Appellee/Cross-Appellant,

and

BEAR MOUNTAIN, L.L.C.,

        Plaintiff/Counter-Defendant-
        Appellee,

v

DEPARTMENT OF NATURAL RESOURCES
and DIRECTOR, DEPARTMENT OF NATURAL
RESOURCES,

        Defendants/Counter-Plaintiffs-
        Appellants/Cross-Appellees.

FOR PUBLICATION
June 2, 2015
9:00 a.m.

No. 321337
Marquette Circuit Court
LC No. 12-050150-CZ

MATTHEW J. TINGSTADT,

        Plaintiff/Counter-Defendant-
        Appellee/Cross-Appellant,

v

DEPARTMENT OF NATURAL RESOURCES
and DIRECTOR, DEPARTMENT OF NATURAL
RESOURCES,

        Defendants/Counter-Plaintiffs-
        Appellants/Cross-Appellees.

No. 321338
Gogebic Circuit Court
LC No. 12-00044-CZ

ROGER TURUNEN, d/b/a HOGAN LAND
IMPROVEMENT COMPANY,

-1-

Plaintiff-Appellee/Cross-Appellant,

v

DEPARTMENT OF NATURAL RESOURCES
and DIRECTOR, DEPARTMENT OF NATURAL
RESOURCES,

Defendants-Appellants/Cross-
Appellees.

No. 321339
Baraga Circuit Court
LC No. 12-006259-CZ

Before: GLEICHER, P.J., and K. F. KELLY and SERVITTO, JJ.

GLEICHER, J.

First published in 1905, *Pigs is Pigs*, by Ellis Parker Butler, tells the story of a railroad agent who insisted on charging the "livestock" rate for a shipment of two guinea pigs, rather than the lower rate applicable to domestic pets. Butler, *Pigs Is Pigs* (Colver Publishing House, 1905), pp 5-6. "Rules is rules," the agent announced, and "th' nationality of the pig creates no differentiality in the rate." *Id.* at 7. The man who had ordered the guinea pigs refused to be bullied by the bureaucratic agent. Rather than pay a rate he viewed as exorbitant (30-cents a guinea pig), the buyer left the creatures at the station. *Id.* at 8. Within weeks, two guinea pigs became hundreds. The chastened agent announced, "Rules may be rules," but henceforth, "pigs is pets." *Id.* at 36.

This case presents a 21st Century pig/rule problem. The Michigan Department of Natural Resources has declared the wild Russian boar an invasive species subject to "dispossession." Plaintiffs own hundreds of Russian boar, which they breed on ranches and offer as targets for hunters. "Rules may be rules," the owners insist, but despite their pigs' "nationality," the targeted swine are domestic and not wild, and therefore are not an invasive species. Furthermore, plaintiffs argue, the DNR's order is void for vagueness and violates the Equal Protection and Due Process Clauses.

The circuit court rejected plaintiffs' vagueness challenge, but concluded that the DNR's order banning the boar ran afoul of the equal protection and due process clauses because it lacked "the standards for a reasonable and rational classification" scheme. Plaintiffs' pigs, the circuit court further determined, are "hybrid" domestic swine rather than wild and invasive pests.

The rules governing our review of this dispute command us to afford great deference to the DNR's method for delineating a particular invasive species. The classification at issue may be imperfect, but it is neither unconstitutionally vague nor irrational. We reverse the circuit court's equal protection and due process rulings, dissolve the injunction it imposed, and affirm that the invasive species order possesses sufficient clarity to pass constitutional muster.

## I. BACKGROUND FACTS AND PROCEEDINGS

Plaintiff Greg Johnson owns a hunting ranch called Bear Mountain, L.L.C., where customers pay a fee to "harvest" Russian boars and other animals. Russian boars are not native to Michigan. According to the DNR, the wild boars now roaming throughout the state (or their boar ancestors) escaped from hunting ranches. Johnson purchased his initial stock of boars from a seller in Canada. His importation permit, issued by the United States Department of Agriculture, specifically labeled the animals as "Wild Boar." Johnson has also obtained boars from plaintiff Roger Turunen, who raises "swine, primarily of the Russian boar breed for sale to game ranches throughout Michigan." Plaintiff Tingstad purchased two pigs from Turunen. He named them "Gretchen" and "Princess Goreya," and attested that he "developed a strong affection for these pigs," which he described as "members of my family." Sadly, both of Tingstad's pet boars are now deceased.

Unlike Gretchen and Princess Goreya, the majority of Russian boars are not lovable pets. Across the United States, large numbers have escaped from hunting ranches and entered the wild, leaving behind a trail of environmental destruction. According to the United States Department of Agriculture, "[t]he rooting and wallowing activities" of escaped boar and their multitudinous offspring "cause serious erosion to river banks and areas along streams. These destructive animals have been known to tear through livestock and game fences and consume animal feed, minerals, and protein supplements." Feral pigs "feast on field crops such as corn, milo, rice, watermelon, peanuts, hay, turf and wheat," and "will prey upon young livestock and other small animals." *Feral/Wild Pigs: Potential Problems for Farmers and Hunters*, Agriculture Information Bulletin No. 799, issued by the United States Department of Agriculture Animal and Plant Health Inspection Service, available at <http://www.aphis.usda.gov/publications/wildlife_damage/content/printable_version/feral%20pigs.pdf> (accessed May 20, 2015).

Michigan's DNR concurs. The page of its website discussing wild pigs recites that "feral swine are a problem for two main reasons—they can host many parasites and diseases that threaten humans, domestic livestock and wildlife; and they can cause extensive damage to forests, agricultural lands and Michigan's water resources." Michigan Department of Natural Resources, *Feral Swine*, available at <http://www.michigan.gov/dnr/0,1607,7-153-10370_12145_55230---,00.html> (accessed May 20, 2015). According to the DNR, "[M]ore than 340 feral swine had been spotted in 72 of Michigan's 83 counties, and 286 have been reported killed. A sow can have two litters a year of four to six piglets. Based on their prolific breeding practices, it is estimated that feral swine in Michigan currently could number between 1,000 and 3,000." *Id.*

Michigan is not the only state plagued with wild pigs. "The 2.6 million pigs in Texas cause $500 million in damage each year—a liability of $200 per pig." Nordrum, *Can Wild Pigs Ravaging the U.S. be Stopped?*, Scientific American, October 14, 2014, available at <http://www.scientificamerican.com/article/can-wild-pigs-ravaging-the-u-s-be-stopped/> (accessed May 20, 2015). Florida's feral hog population, estimated at between 500,000 and one million animals, is second only to that of Texas. *2012 Annual State Summary Report of the Wild Hog Working Group*, Southeastern Association of Fish and Wildlife Agencies (SEAFWA), available at <http://www.agfc.com/species/documents/2012annualstatesummaryreporthog.pdf>

(accessed May 20, 2015), p 24. The SEAFWA Wild Hog Working Group characterizes feral swine as "highly mobile disease reservoirs" that "can carry at least 30 important viral and bacterial diseases, and a minimum of 37 parasites that affect people, pets, livestock, or wildlife." *Id.* at 51. In a video presentation posted on the Michigan DNR website titled, "A Pickup Load of Pigs: The Feral Swine Pandemic," Dr. Michael Bodenchuk, Texas State Director of Wildlife Services, observes: "In Texas, we say that any fence that will hold water will hold hogs. Fences may be hog resistant but they are not hog proof and eventually hogs will be able to breach any fence." Available at <http://www.michigan.gov/dnr/0,1607,7-153-10370_12145_55230-251114--,00.html> (accessed May 20, 2015).

Closer to home, in 2002 the Baraga County Prosecuting Attorney, Joseph P. O'Leary, implored Governor John Engler to motivate "appropriate state agencies" to take action against wild Russian boar that had escaped from a local "game preserve." According to O'Leary, the "strong, fast, intelligent, large (300+ pounds)" boars "will eat just about anything," and posed "a serious threat to humans." The letter closed:

> You should be also be aware that I am advising property owners on the Point Abbaye Peninsula that they do not have to sit idly by while their property is destroyed and their lives or their children's lives are threatened. I have advised them that they have the right to defend themselves and their property from these dangerous animals, including shooting the animals if that is what it takes.

Within several years of O'Leary's letter, agricultural, environmental and natural resource organizations joined forces to lobby Michigan's Legislature and the DNR for a state-wide solution to the wild boar problem. Their efforts culminated in two official acts: the Legislature's passage of a statute authorizing certain individuals to shoot on sight "swine running at large," MCL 433.14a, and the DNR's issuance of Invasive Species Order Amendment No. 1 (ISO), adding Russian wild boar and their hybrids to the list of Michigan's invasive species. The ISO provides in relevant part:

> Possession of the following live species, including a hybrid or genetic variant of the species, an egg or offspring of the species or of a hybrid or genetically engineered variant, is prohibited:
>
> * * *
>
> (b) Wild boar, wild hog, wild swine, feral pig, feral hog, feral swine, Old world swine, razorback, eurasian wild boar, Russian wild boar (*Sus scrofa Linnaeus*). This subsection does not and is not intended to affect *sus domestica* involved in domestic hog production.

The DNR issued the ISO in August 2011, and delayed its effect first until October 8, 2011, and then until April 1, 2012.

The ISO was met with a firestorm of opposition from Russian boar owners. One owners' group sued the DNR, alleging that it amounted to an unconstitutional taking of property and that the DNR's director lacked the legal authority to issue it. We rejected those challenges in *Mich Animal Farmers Ass'n v Dep't of Natural Resources & Environment*, unpublished opinion per

curiam of the Court of Appeals, issued March 1, 2012 (Docket No. 305302).[1] On another front, the Michigan Animal Farmers Association (MAFA) petitioned for a declaratory ruling from the DNR pursuant to MCL 24.263, seeking more information concerning the scope of the order and the manner in which it would be applied. MAFA queried, "Specifically, what kind of qualitative testing will the MDNR be conducting and what results will determine if a specific animal is a hybrid, genetic variant or offspring or the prohibited swine listed in the ISO?"

The DNR responded by issuing a declaratory ruling describing the nine "specific physical, biochemical, or behavioral characteristics" it would use to correctly identify *Sus scrofa*, the Linnaean name for the species deemed invasive by the ISO.[2] For example:

- Bristle-tip coloration: *Sus scrofa* exhibit bristle tips that are lighter in color (e.g., white, cream, or buff) than the rest of the hair shaft. This expression is most frequently observed across the dorsal portion and sides of the snout/face, and on the back and sides of the animal's body.

- Dark "point" coloration: *Sus scrofa* exhibit "points" (i.e., distal portions of the snout, ears, legs and tail) that are dark brown to black in coloration, and lack light-colored tips on the bristles.

* * *

- Tail Structure: *Sus scrofa* exhibit straight tails. They contain the muscular structure to curl their tails if needed, but the tails are typically held straight. Hybrids of *Sus scrofa* exhibit either curly or straight tail structure.

- Ear Structure: *Sus scrofa* exhibit erect ear structure. Hybrids of *Sus scrofa* exhibit either erect or folded/floppy ear structure.

Rather than soothing the boar owners' hostility to the ISO, the declaratory ruling threw gasoline on the flames. Plaintiffs and others objected that many of the characteristics listed by the DNR applied to run-of-the-mill, barnyard pigs. Given that *all* pigs have erect or floppy ears and straight or curly tails, plaintiffs urged, the declaratory ruling confounded their ability to

---

[1] Plaintiffs in these consolidated cases have not challenged the authority of the DNR to issue an invasive species order.

[2] During the 18th Century, Swedish botanist and zoologist Carl Linnaeus developed a system for classifying organisms, which bears his name. According to that system, "*sus*" refers to the genus and "*scrofa*" refers to the species. The DNR maintains that *sus domestica* properly names the species of pig we equate with barnyards and pork production. There are more than two species of pigs, but we need not concern ourselves with the rest of them. And lest there be any confusion, guinea pigs are actually a species of rodent: *cavia porcellus*.

determine whether their pigs must go.  They maintained that the DNR's categorization scheme lacked scientific validity and opened the door to their prosecution for possession of "domestic," penned, well-cared-for pigs bearing the same distinguishing characteristics as feral boar.  These three lawsuits, filed in three different circuit courts, followed.[3]  The parties agreed to consolidate the cases in the Marquette Circuit Court for resolution of their common legal issues.

Both sides moved for summary disposition under MCR 2.116(C)(10).  They provided the court with voluminous evidence, including published scientific literature and testimony given by veterinarians and animal scientists.  Plaintiffs did not take issue with the notion that free-ranging Russian boars present real and serious environmental danger.  Rather, they insisted that their pigs are not "wild," and do not fall within the ambit of the ISO.  Plaintiffs stressed that "all pigs, regardless of breed or nickname, are of one and the same species and all are descended from one and the same ancestor, the eurasian wild boar."  Thus, they argued, the invasive species order as clarified by the declaratory ruling arbitrarily and capriciously selected only one type of pig—the wild Russian boar—for prohibition.  Echoing Ellis Parker Butler, plaintiffs emphasize that "pigs are pigs," and even a barnyard hog will "transition" to a feral menace if given the opportunity.

Moreover, plaintiffs contended, the characteristics distinguishing Russian boars from their porcine cousins lacked practical utility, since domestic and wild pigs share many of the same traits as those listed in the declaratory ruling.[4]  Plaintiffs highlighted a statement made by Dr. John J. Mayer, a scientist who consulted with the DNR in developing the ISO, that "the identification of completely reliable defining characteristics" for feral hogs, Eurasian wild boar, and hybrids between the two "has yet to be achieved."  Mayer & Brisbin, *Texas Natural Wildlife: Distinguishing Feral Hogs From Introduced Wild Boar and Their Hybrids: A Review of Past and Present Efforts*, available at <http://agrilife.org/texnatwildlife/feral-hogs/distinguishing-feral-hogs-from-introduced-wild-boar/> (accessed May 20, 2015).

The DNR countered that the invasive species order identified a prohibited *species*, as required by MCL 324.41302(3).[5]  Shannon J. Hanna, a wildlife biologist employed by the DNR, averred:

---

[3] Two additional cases raising the same issues were filed in two additional counties, but these have been resolved or dismissed and we need not consider them.

[4] The DNR admitted in response to a request for admission that "not every phenotype characteristic" listed in the declaratory ruling "is unique to *Sus scrofa Linnaeus*.  Some of the characteristics in the list may be shared by some breeds of the species *Sus domestica*."

[5] In January 2015, the Legislature amended MCL 324.41301 *et seq*., generally called the Invasive Species Act.  The amendments took effect on April 15, 2015.  Before the amendment, MCL 324.41302(3) provided in pertinent part:

> The commission of natural resources or the commission of agriculture, as applicable, shall list a species as a prohibited species or restricted species if the commission of natural resources or commission of agriculture, respectively, determines the following:

The separation of *Sus scrofa* (wild boars) and *Sus domestica* (domestic pigs) into different species is a scientifically accepted method of classifying these animals. Scientific and taxonomic resources classify wild boars and domestic pigs as separate species rather than subspecies. For example, Corbet, G.B., and Hill, J.E., The Mammals of the Indomalayan Region: A Systemic Review (British Museum: 1922), which lists the scientific nomenclature of the region's mammals, classifies wild boars (*Sus scrofa*) and domestic pigs (*Sus domestica*) as separate species.

Hannah explained that "[i]f two animals cannot breed and create fertile offspring, then they are considered separate species." "However, the converse is not true," she elaborated. "[W]olves . . . and domestic dogs . . . are different species, but can breed and produce fertile offspring." So can *Sus scrofa* and *Sus domestica*. Nonetheless, Hannah asserted, they are separate species. In less scientifically sophisticated parlance, the DNR advocated: "A Russian boar inside a fence does not become a different species when it escapes or is released and becomes wild." Regardless that plaintiffs' boars reside in pens, the DNR contended, the invasive species order properly outlaws them.

Plaintiffs also sought a declaratory judgment that the invasive species order and declaratory ruling were void for vagueness, claiming that neither affords the DNR with a reliable method of distinguishing between forbidden and permitted swine. Given that all pigs share the same ancestral lineage and many of the same physical features, plaintiffs urged, enforcement of the invasive species order would result in the "unfettered, unlimited discretion" of the DNR to

---

(a) For a prohibited species, all of the following requirements are met:

(*i*) The organism is not native to this state.

(*ii*) The organism is not naturalized in this state or, if naturalized, is not widely distributed in this state.

(*iii*) One or more of the following apply:

(A) The organism has the potential to harm human health or to severely harm natural, agricultural, or silvicultural resources.

(B) Effective management or control techniques for the organism are not available.

The amended version of this subsection now appears at MCL 324.41302(2). The Legislature added the word "nonaquatic" before the term "prohibited species," eliminates the words "to this state" from former subsection (3)(a)(*ii*), and substitutes the term "relevant commission" for the previous term "[t]he commission of natural resources or the commission of agriculture." With respect to the control of mammalian species, "[t]he relevant commission" is now defined as "the natural resources commission, department of natural resources, or the director of the department of natural resources, respectively." MCL 324.41301(1)(m).

eliminate whichever pigs it chooses. The DNR riposted that plaintiffs' admission to owning Russian boar dispensed with their vagueness claim.

The circuit court ruled that plaintiffs lacked standing to assert a vagueness challenge because they admitted to owning the animals identified in the order. However, the court sided with plaintiffs on their equal protection and due process claims. The circuit judge also concluded that the animals under plaintiffs' control were exempt from the invasive species order because they qualified as domestic hogs. The court enjoined any enforcement of the ISO directed against plaintiffs' pigs.

In June 2014, after the court entered its order granting plaintiffs' partial summary disposition, the DNR rescinded the declaratory ruling. The rescission notice is a public record, and we have taken judicial notice of it. MRE 201. The notice states that the species *Sus scrofa Linnaeus*, or Russian boar and their hybrids, remain prohibited under the invasive species order, but that *Sus domestica*, including "pigs like Mangalitsa, Duroc, Yorkshire, and Hampshire" are not illegal.[6] The DNR explained in the notice that it rescinded the declaratory ruling because "[m]any in the public have confused the Declaratory Ruling with the Invasive Species Order and misread it as interpreting the Invasive Species Order to apply to animals other than Russian boar and their hybrids."

The DNR now appeals on leave granted the circuit court's order granting plaintiffs' summary disposition motion in part. Plaintiffs cross appeal the circuit court's order dismissing their void-for-vagueness claim.

## II. ANALYSIS

We review de novo the circuit court's summary disposition ruling. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). A court may grant summary disposition under subrule (C)(10) if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. *Id*. Whether a party has standing is a legal question subject to de novo review. *Manuel v Gill*, 481 Mich 637, 642; 753 NW2d 48 (2008). We also apply de novo review to constitutional questions. *Bonner v City of Brighton*, 495 Mich 209, 221; 848 NW2d 380 (2014).

We begin by narrowing the frame of debate. Because the DNR has rescinded the declaratory ruling, we need not consider the uncertainties and ambiguities created by that document. The remaining issues are whether the ISO is unconstitutional on due process or equal protection grounds, or void for vagueness. Furthermore, plaintiffs do not assert that the ISO is unconstitutionally arbitrary or capricious in all possible applications; we do not understand plaintiffs to argue that the DNR improperly trained its sights on the Russian boars living in the wild. Rather, plaintiffs complain that if the ISO covers *their* swine, it violates constitutional standards.

---

[6] The names refer to breeds rather than to individual pigs.

Well-established principles guide our analysis. As a regulatory action that does not implicate fundamental rights, the ISO is subject to rational-basis review.[7] Therefore, it need only be rationally related to a legitimate government purpose to survive plaintiffs' challenge. *Wysocki v Kivi*, 248 Mich App 346, 354; 639 NW2d 572 (2001). Rational-basis review is highly deferential. *Phillips v Mirac, Inc*, 470 Mich 415, 433; 685 NW2d 174 (2004). The limited scope of our inquiry "reflects the judiciary's awareness that it is up to legislatures, not courts, to decide on the wisdom and utility of legislation." *American States Ins Co v Dep't of Treasury*, 220 Mich App 586, 597; 560 NW2d 644 (1996) (quotation marks and citation omitted).

The ISO bears a presumption of constitutionality, "and the party challenging it bears a heavy burden of rebutting that presumption." *People v Idziak*, 484 Mich 549, 570; 773 NW2d 616 (2009) (quotation marks and citation omitted). "To prevail under this highly deferential standard of review, a challenger must show that the legislation is arbitrary and wholly unrelated in a rational way to the objective of the statute." *Id.* at 570-571 (quotation marks and citation omitted). "A rational basis exists for the legislation when any set of facts, either known or that can be reasonably conceived, justifies the discrimination." *Morales v Parole Bd*, 260 Mich App 29, 51; 676 NW2d 221 (2003). We must uphold the ISO if the DNR's decision to issue it is "supported by any set of facts, either known or which could reasonably be assumed, even if such facts may be debatable." *Crego v Coleman*, 463 Mich 248, 259-260; 615 NW2d 218 (2000). Thus, only in rare and exceptional cases will rational-basis review result in invalidating a law.

We now apply these principles to the arguments before us.

## A. THE EQUAL PROTECTION CHALLENGE

The DNR first takes aim at the circuit court's ruling that the ISO contravenes the Equal Protection Clauses of the United States and Michigan Constitutions, US Const, Am XIV; Const 1963, art 1, § 2, which guarantee the right to equal protection of the law. The circuit court found that the ISO unreasonably and arbitrarily classifies the pigs "under the[] control and husbandry" of plaintiffs as an invasive species, while permitting unfettered ownership of swine "under the control and husbandry of other pig farmers." Both pig varieties descended from a common ancestor and are genetically related, the circuit court observed. Because the favored pigs and the banned pigs share many characteristics, the court reasoned, the DNR irrationally, unreasonably, and arbitrarily classified them disparately.

---

[7] When the Legislature grants rulemaking authority to an agency such as the DNR, the validity of a rule or regulation hinges on whether the administrative action: (1) falls "within the subject matter of the enabling statute," (2) "complies with the legislative intent underlying the enabling statute," and (3) is not "arbitrary or capricious." *Mich Farm Bureau v Dep't of Environmental Quality*, 292 Mich App 106, 129; 807 NW2d 866 (2011). Plaintiffs have not challenged the first two preconditions. The third, which calls for upholding a challenged rule if it is not arbitrary or capricious, equates with rational-basis analysis: "If a rule is rationally related to the purpose of the statute, it is neither arbitrary nor capricious." *Dykstra v Dep't of Natural Resources*, 198 Mich App 482, 491; 499 NW2d 367 (1993).

The DNR counters that "[t]he feral swine problem in Michigan is a Russian boar problem," and the ISO's division of pig species into *Sus scofa* and *Sus domestica* is justified by the evidence. In our view, the DNR has the better argument, as the classifications set forth in the ISO are reasonable and rationally related to legitimate environmental objectives.

When applying the highly deferential review afforded to environmental regulations, courts must uphold a classification against an equal protection challenge "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v Beach Communications, Inc*, 508 US 307, 313; 113 S Ct 2096, 124 L Ed 2d 211 (1993).

> In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational. [*Nordlinger v Hahn*, 505 US 1, 11; 112 S Ct 2326; 120 L Ed 2d 1 (1992) (citations omitted).]

We look to reasons that the DNR promulgated the ISO, and whether those reasons logically justify the rule.

In prohibiting the possession of all pigs of the species *Sus scrofa Linnaeus*, the DNR reasoned that pigs of this species are environmental "bad actors." They escape, breed vigorously, spread disease, eat crops, defecate in lakes, and generally cause ecological mayhem. Domestic pigs, *Sus domestica*, stay home. Michigan has not experienced an epidemic of escaping barnyard pigs. While one of plaintiffs' expert witnesses averred that traditionally-farmed pigs eventually develop feral tendencies if loosed into the wild, no evidence substantiates that significant numbers of domesticated pigs actually get away and remain on the run. Domestic pigs simply do not cause the vexing environmental problems created by their boar cousins. The policy reasons for the distinction between *Sus scrofa* and *Sus domestica* qualify as plausible, evidence-based, and directly related to the goal of eradicating Michigan's wild boar scourge.

While plaintiffs appear to be highly responsible Russian boar owners, the fact remains that all Russian boars now inhabiting the wilds of our state were once penned Russian boar, or are descended from such animals. The DNR's decision to ban "Russian wild boar (*sus scrofa Linnaeus*)" advances the DNR's legitimate objective of preventing any augmentation of the present wild pig population. We emphasize that "[a] classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequity." *Heller v Doe*, 509 US 312, 321; 113 S Ct 2637; 125 L Ed 2d 257 (1993) (quotation marks and citation omitted). The United Supreme Court amplified this point in *Heller*: "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Id*. (quotation marks and citation omitted). As judges, we are not equipped to weigh the genetic or behavioral differences in hog species. The Legislature has consigned this task to the DNR.

Thus, the ISO easily survives plaintiffs' equal protection challenge. That the DNR has chosen to ban possession of certain pigs and not others embodies a reasonable exercise of

discretion. Nor did the DNR arbitrarily or capriciously classify wild Russian boar as an invasive species harboring the capacity to harm natural and agricultural resources. Although the ISO discriminates among pigs, the distinctions it draws are eminently rational, and thereby permissible. The circuit court erred by finding otherwise.

## B. THE DUE PROCESS CHALLENGE

Next, we consider whether the ISO contravenes substantive due process principles contained within the United States and Michigan Constitutions, US Const, Am XIV; Const 1963, art 1, § 17. The circuit court found that the distinctions between pig species articulated by the ISO and the declaratory ruling lacked reasonably precise standards, and swept so broadly that they subjected plaintiffs for prosecution for owning "legal" pigs. On appeal, plaintiffs add that the ISO "lacks any standards whatsoever," thereby making "every pig in Michigan a prohibited species[.]" The ISO "is so lacking in standards," they claim, that it bans their pigs despite that the targeted boar are not wild and do not create the problems the ISO seeks to prevent.[8] Further, plaintiffs assert, the ISO lacks any substantial relationship to the health, safety, morals or general welfare, as "any pig not properly controlled" and managed by humans can cause the same environmental ruin as feral pigs.

"While the touchstone of due process, generally, 'is protection of the individual against arbitrary action of government,' the substantive component protects against the arbitrary exercise of governmental power[.]" *Bonner*, 495 Mich at 224 (citations omitted). To satisfy due process standards, the ISO must reasonably relate to a legitimate governmental purpose. *Id*. at 230. The ISO easily passes this test.

The evidence advanced by the DNR supports that the pigs identified in the ISO, "[w]ild boar, wild hog, wild swine, feral pig, feral hog, feral swine, Old world swine, razorback, Eurasian wild boar, Russian wild boar (*sus scrofa Linnaeus*)" and their "hybrids or genetic variant[s]" pose a serious threat to Michigan's farming industry and natural resources. Plaintiffs offered no evidence to the contrary. Given the DNR's well-founded fear that escaped boar of the species *Sus scrofa Linnaeus* will decimate existing ecosystems, the decision to name these pigs as invasive species is neither arbitrary nor capricious. The ISO bears a rational relationship to the DNR's interest in protecting the environment from the perils posed by escaped Russian boar. We discern no substantive due process violation.

Plaintiffs' insistence that *their* Russian boars are not "wild," and therefore incapable of ravaging the environment, does not alter our analysis. By excluding "*sus domestica* involved in domestic hog production" from the ISO's reach, plaintiffs assert, the DNR has impermissibly and arbitrarily treated their boar as second-class swine. We remain unpersuaded that the DNR's classification system contravenes substantive due process principles.

---

[8] Plaintiffs' due process arguments overlap with their void-for-vagueness claims. We address the latter in section C.

As we observed in the equal protection context, our Legislature has designated the DNR as the arbiter of invasive species. The DNR sighted on particular swine, which it defined with nomenclature found in "[s]cientific and taxonomic resources[.]" The Latin words employed by the DNR apparently engender controversy among those engaged in the academic study of pigs, but we need not enter that debate. The DNR's approach to its task rests on rational grounds. The evidence presented by the DNR substantiates that the pigs identified in the ISO threaten the environment even though many of them are currently caged. Logically, we cannot quarrel with the notion that reducing Michigan's total wild boar population will slow the growth of the boar population living outside fences. Accordingly, we find no substantive due process violation, and reverse the circuit court's contrary ruling.

## C. THE VOID-FOR-VAGUENESS CHALLENGE

Before mounting their due process and equal protection challenges, plaintiffs moved for summary disposition on void for vagueness grounds. The circuit court ruled that plaintiffs lacked standing to argue that the ISO is unconstitutionally vague, because each admitted to possessing the animals identified in the ISO. Plaintiffs now cross appeal this ruling, contending that the circuit court applied standing principles no longer accepted by the Michigan Supreme Court.

Although not displeased with the circuit court's ultimate ruling on this issue, the DNR also finds fault with the circuit court. According to the DNR, the circuit court employed a stealth "void for vagueness" analysis when it granted summary disposition of plaintiffs' due process claims by ruling that the ISO failed to provide fair warning as to which pigs must be dispossessed. We agree with the DNR. "[A]t the risk of committing a felony," the circuit court queried in its summary disposition opinion, "how is one to know whether a hybrid pig possessed by a farmer or a game rancher such as Plaintiff Turunen or Johnson is, or is not, in violation of the ISO and Statute?" This sounds like a vagueness concern.

The circuit court resolved the question correctly the first time around: the ISO provides fair notice that plaintiffs' pigs are prohibited. Its terms are clear enough. Whether living domestically or in the wild, *Sus scrofa Linnaeus* is now deemed an invasive species. Plaintiffs quarrel with the legitimacy of the *Sus scrofa Linnaeus* designation, but they do not deny that their pigs meet it. Accordingly, their void-for-vagueness challenge lacks merit.

"Due process requires that a State provide meaningful standards to guide the application of its laws." *Pacific Mut Life Ins Co v Haslip*, 499 US 1, 44; 111 S Ct 1032; 113 L Ed 2d 1 (1991) (O'CONNOR, J., dissenting). Void-for-vagueness tenets embrace the principle that a law is unconstitutional "if its prohibitions are not clearly defined." *Grayned v City of Rockford*, 408 US 104, 108; 92 S Ct 2294; 33 L Ed 2d 222 (1972). The Supreme Court explained:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. [*Id.* at 108-109 (citations omitted.]

Because we are "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Id*. at 110.

To give fair notice, a statute "must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited or required." *Kenefick v Battle Creek*, 284 Mich App 653, 655; 774 NW2d 925 (2009) (quotation marks and citation omitted). It may not use terms that require persons of common intelligence to guess at their meaning and differ as to its application. *People v Hrlic*, 277 Mich App 260, 263; 744 NW2d 221 (2007). On the other hand, a statute is sufficiently definite if its meaning can be "fairly ascertain[ed] by reference to judicial interpretations, the common law, agency rules, dictionaries, treatises, or the commonly accepted meanings of the words." *People v Sands*, 261 Mich App 158, 161; 680 NW2d 500 (2004).

The ISO's delineation of the species declared invasive leaves little to the imagination. The words used to identify forbidden pigs do not describe Porky Pig, guinea pigs, or any of the swinish breeds associated with a farm or a livestock yard. Moreover, plaintiffs are well aware of the differences between their boars and pigs raised for agricultural purposes. We find disingenuous plaintiffs' objection that the ISO's inclusion of the modifier term "wild" excludes their penned boars. Plaintiffs purchased "wild Russian boar" and still own the boars they brought to Michigan, or their offspring, or hybrids of progenitor wild Russian boar. Further, plaintiffs filed these actions because they *knew* that the DNR intended to dispossess them of their animals.[9] The lines drawn in the ISO between protected and prohibited pigs are neither elusive nor uncertain, and suffice to provide fair notice to swine owners of ordinary intelligence. No more is required. We affirm the circuit court's initial ruling that the ISO is not unconstitutionally vague.

D. THE INJUNCTION

The circuit court ruled that "[t]o the extent enforcement of the ISO against these Plaintiffs would constitute a taking of their property under an administrative order not meeting constitutional standards" an injunction prohibiting any seizure of plaintiffs' pigs would issue. We have determined that the ISO meets constitutional standards in all respects. Accordingly, we dissolve the injunction.

---

[9] We agree with plaintiffs that the circuit court incorrectly invoked a "standing" analysis to reject their vagueness challenge. Plaintiffs had standing to complain that as applied to them, the ISO is unconstitutionally vague. Their admission that they own some "wild Russian boar" is evidence that the ISO is not vague, but did not foreclose their vagueness argument.

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction. No taxable costs may be imposed under MCR 7.219, as this case presents important public policy questions.

/s/ Elizabeth L. Gleicher
/s/ Kirsten Frank Kelly
/s/ Deborah A. Servitto