*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ROGER TURUNEN, doing business as HOGAN LAND IMPROVEMENT COMPANY,

FOR PUBLICATION
March 18, 2021
9:05 a.m.

Plaintiff/Cross-Defendant-Appellee,

v

No. 350913
Baraga Circuit Court
LC No. 2012-006259-CZ

DIRECTOR OF THE DEPARTMENT OF NATURAL RESOURCES and DEPARTMENT OF NATURAL RESOURCES,

Defendants/Cross-Plaintiffs-
Appellants.

Before: MURRAY, C.J., and M. J. KELLY and RICK, JJ.

MURRAY, C.J.

The legal battle over whether plaintiff's pigs were unlawful under the Department of Natural Resource's Invasive Species Order Amendment 1 (ISO) has been a long and contentious one, and is now before this Court for a fifth time. On two prior occasions this Court issued opinions on the merits, see *Johnson v Dep't of Natural Resources*, 310 Mich App 635; 873 NW2d 842 (2015) and *Turunen v Dir, Dep't of Natural Resources*, unpublished per curiam opinion of the Court of Appeals, issued July 5, 2018 (Docket No. 336075) (*Turunen I*), while on two other occasions the Court turned down requests for interlocutory review. See *Turunen v Dir, Dep't of Natural Resources*, unpublished order of the Court of Appeals, entered December 6, 2013 (Docket No. 317933) and *Turunen v Dir, Dep't of Natural Resources*, unpublished order of the Court of Appeals, entered September 12, 2016 (Docket No. 332811). With this appeal, we are provided the opportunity to review the final judgment entered in plaintiff's favor after a bench trial, in which the trial court held that the eight pigs at issue—which were all dead prior to trial—were not unlawful. We affirm that decision. We do, however, reverse the decision of the trial court holding that the ISO was unconstitutionally vague as applied.

## I. BACKGROUND

The background facts are succinctly stated in this Court's opinion in *Turunen I*, unpub op at 2-3:

In 2010, the Department of Natural Resources (DNR) issued ISO Amendment 1, which "add[ed] Russian wild boar and their hybrids to the list of Michigan's invasive species." *Johnson*, 310 Mich App at 643. The amended ISO provided in pertinent part that:

Possession of the following live species, including a hybrid or genetic variant of the species, an egg or offspring of the species or of a hybrid or genetically engineered variant, is prohibited:

\* \* \*

(b) Wild boar, wild hog, wild swine, feral pig, feral hog, feral swine, Old world swine, razorback, [E]urasian wild boar, Russian wild boar (Sus scrofa Linnaeus). This subsection does not and is not intended to affect sus domestica involved in domestic hog production. [§ 40.4(1)(b).]

Under part 413 of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.41301 *et seq.*, a person may not possess, sell, or introduce a prohibited species. MCL 324.41303; MCL 324.41306; MCL 324.41309. Defendants offered training on how to distinguish Sus scrofa from Sus domestica from Dr. John Mayer, an internationally known biologist, to their personnel as well as local animal owners. That training taught them how to identify the animals by genotype ("the unique genetic make-up of a species") and phenotype ("the expression of those genes, which results in specific physical, biochemical, or behavioral characteristics"). Defendants issued a declaratory ruling (DR), which it later rescinded, that listed eight phenotypes for identifying Sus scrofa modeled after Dr. Mayer's training.[3] Despite its rescission of the DR, defendants continued to refer to those phenotypes as a guide for identification.

On February 21, 2012, plaintiff filed a Complaint for Declaratory Ruling and Injunctive Relief for the court to determine the applicability of the ISO to his animals. On March 26, 2012, defendants filed a counterclaim for declaratory and injunctive relief alleging that plaintiff was required to abate the public nuisance of owning Russian Boar. Plaintiff's case was later consolidated with the cases of other plaintiffs challenging the DR and ISO, and in March 2014, the Marquette circuit court granted them summary disposition as to their claims that the ISO violated the equal protection and due process clauses, and was void for vagueness. This Court, in *Johnson v Dep't of Natural Res*[*ources*], [310 Mich App 635], disagreed and found the ISO constitutional. The plaintiffs' cases were remanded to their home circuit courts. On remand, defendants conducted inspections of plaintiff's hogs on December 18, 2015, and September 28, 2016. Defendants motioned the court to enter an order for voluntary dismissal of their counterclaim after defendants found no Russian wild boar at plaintiff's facility in December 2015. That motion was

denied. The circuit court determined that *Johnson v Dep't of Natural Res*[*ources*], 310 Mich App 635, rendered plaintiff's 2012 complaint allegations regarding the ISO's constitutionality moot, but found that the allegations in defendants' March 2012 counterclaim were still viable.

In September 2016, the defendants conducted an inspection, and identified eight pigs they believed were either Russian wild boar or hybrids thereof. The case continued to a bench trial where the issue before the court became whether plaintiff's eight animals were properly classified by defendants as being prohibited under the ISO. . . .

---

[3] The sum of those characteristics were: 1) an arched dorsal profile or arched back; 2) front shoulders that were larger than the hind quarters; 3) darker colored fur toward the hooves; 4) "dark brown to blackish in color, sometimes gray" fur with "light tipped bristles;" 5) erect ears and a straight tail that were both darker at the tips; 6) a facial mask that appeared as a light-colored beard; 7) more slender from a frontal profile with eyes that appeared more on the side of their head; and 8) an elongated rostrum or nose.

---

A trial was conducted on the DNR's counterclaim. Each side presented witnesses and expert witnesses on whether the eight pigs were unlawful under the ISO. The DNR presented the expert testimony of DNR wildlife specialists Duane Etter and Brian Roell (a point person in Michigan for feral swine and Sus scrofa), and Michigan State University associate professor Dr. Juan Steibel, who specializes in genetics and animal breeding. Plaintiff offered his own testimony, as well as that of Shannon Hanna, a DNR wildlife division supervisor involved in implementing the ISO in 2011-2012, as well as several individuals—Chris Helpin, veterinarian Donald Martinson, and Kevin Kirk—who have extensive familiarity with plaintiff's operations and pigs.

On November 22, 2016, the circuit court issued an opinion and order containing the following findings of fact:

1. In December of 2010, the MDNR issued Invasive Species Order Amendment No. 1, adding Sus scrofa Linnaeus to Michigan's list of invasive species.

2. The ISO was issued pursuant to authority conferred upon the MDNR by virtue of the provisions of The Natural Resources and Environmental Protection Act (NREPA), MCL 324.40101, *et seq*.

3. Common names that have been given to Sus scrofa include wild boar, wild hog, feral swine, feral pig, feral hog, Old world swine, razorback, [E]urasian wild boar and Russian boar.

4. In order to assist in identifying animals prohibited by the ISO, the MDNR sought input from Dr. John J. Mayer, a recognized expert in wild hogs.

5.  As a result of its contacts with Dr. Mayer, the MDNR issued a declaratory ruling to assist members of the public in identifying illegal animals (Sus scrofa and hybrids) and to inform the public of the factors which would be utilized by the MDNR to identify Sus scrofa and Sus scrofa hybrids.

6.  Because research is not sufficiently advanced, genetic testing is not yet able to differentiate between the two (2) species of pigs and their hybrids.  The MDNR, therefore, is required to utilize morphology in an attempt to identify members of the prohibited species and their hybrids.

7.  Although rescinded, the MDNR continues to utilize the points set forth in the declaratory ruling to identify pigs which it deems prohibited by the ISO.  (See Pl ex 48)

8.  Included in those traits that the MDNR deems indicative of Sus scrofa are:  Body type and shape, arched dorsal profile, larger front shoulders compared to hind quarter, more slender than domestic animals, fully furred, light-tipped bristles, usually dark brown to black or gray in color, facial masks, elongated (not dish faced) rostrums, straight tail and ear, lighter colored underfur, dark point coloration, eyes set to side of head, dorsal mane, grizzled coat and more slender than domestic animals.

9.  Pure unhybridized populations of Eurasian/Russian wild boar probably no longer exist in this country.  (See Pl ex 90, p 226)

10.  Some characteristics of Russian boar are shared by domestic pigs; nonetheless, if a pig exhibits only one (1) characteristic of a Russian boar it can be classified as a Russian boar.

11.  To date, a pig has not been ordered "depopulated" if it exhibited only one (1) trait of a Russian boar.

12.  Characteristics of Russian boar are difficult to ascertain.  For example, split tips can give the appearance of light-tipped bristles, and split tips exist in domestic swine.  Observer designations of pelage can be subject to debate.  (See Pl ex 90, p 186, p 195-196.  See also Pl ex 26)

13.  Environment, nutrition, gender and age can affect a pig's phenotype.

14.  There are many morphological similarities amongst domestic breeds, feral pigs, [E]urasian wild boar and some heritage breeds which make distinguishing them from one another difficult and problematic.  (See Pl ex 26)

15.  A feral pig may be a domestic pig living in the wild.

16.  The identification of completely reliable characteristics for feral hogs, [E]urasian wild boar and hybrids between the two has yet to be achieved.  (See Def ex 48)

17. An animal can exhibit Sus scrofa characteristics and yet not be classified, by the MDNR, as invasive.

18. On September 28, 2016, the MDNR identified eight (8) animals owned by Roger Turunen as being prohibited Sus scrofa or hybrids, although the eight (8) animals[] differed in the degree and extent of Sus scrofa traits exhibited.

19. None of the eight (8) animals deemed prohibited by the MDNR exhibited all of the traits associated with Sus scrofa Linnaeus.

20. Some of Plaintiff's animals, not deemed invasive by the MDNR, exhibited phenotypes of Sus scrofa.

21. The determination of whether an animal is invasive when exhibiting more than one (1) trait of Sus scrofa, but less than all the traits associated with Sus scrofa, is dependent upon the opinion, subjective judgment and interpretation of the person who reviews the animal on behalf of the MDNR, as there is not an explicit, clear standard in that regard.

22. The individual reviewing an animal on behalf of the MDNR, due to the complexities involved, may be required to seek out the aid of other experts, both internally and externally, in order to reach a decision regarding the legal status of the animal.

The circuit court then made the following conclusions of law:

1. The utilization of phenotypes to identify Russian boar and hybrids is problematic and can be difficult.

2. The evidence did not establish a clearly defined, explicit standard to determine when a pig exhibiting some traits of Sus scrofa crosses the line and becomes invasive under the ISO.

3. To determine if an animal is invasive[] may require the input of multiple experts, and laypersons would generally lack sufficient ability to know when an animal[] exhibits traits sufficient to be deemed invasive.

4. The testimony offered by the MDNR that eight (8) of Plaintiff's animals are invasive under the ISO is not based on reliable principles and methods; in that, such determination is not reliant on a clearly defined standard, or upon the identification of completely reliable morphologies or phenotypes; and thus, the testimony offered does not satisfactorily establish the proposition asserted. MRE 702.

5. Defendant, on its counter[]claim, has not met its burden of proof that eight (8) of Plaintiff's animals, or any of them, are prohibited by the ISO.

The court entered a judgment of no cause of action on defendant's counterclaim and denied defendant's request for injunctive relief and for sanctions.

After a remand from the panel in *Turunen I*, the trial court received briefs on whether the ISO was unconstitutionally vague as applied to plaintiff, and whether the eight pigs identified by the DNR were unlawful under the ISO. After incorporating by reference the findings of fact and conclusions of law stated in its November 22, 2016 opinion and order, the court held that the ISO was unconstitutionally vague as applied to plaintiff:

> At oral argument, counsel for the DNR asserted that the depiction of the pig exhibited on the DNR website provided the public, including Mr. Turunen, with fair notice of what would constitute a prohibited animal. It does not.

> As admitted by the DNR on page six (6) of its March 28, 2019[] brief, the photograph posted on its website is that [of] a pure Russian boar; however, to be deemed illegal by the DNR, an animal need not be a pure Russian boar. In fact, pure unhybridized populations of Eurasian/Russian wild boar probably no longer exist in this country. (Plaintiff Exhibit 90, page 226; T-181)

> Concerning Mr. Turunen's eight (8) pigs, the evidence offered by the Defendant at trial would support only a finding that each pig was, at best, a Russian boar hybrid, meaning that each animal would be a cross breed between Russian boar stock and domestic pig stock. (T 685-686). As such, Mr. Turunen's animals would exhibit less than all of the traits which the DNR associates with Sus scrofa[] (T-47). Mr. Turunen's pigs, therefore, would not mirror the pure Russian boar shown on Defendant's website, and thus, the website's depiction did not provide Mr. Turunen with fair notice as to what would necessarily constitute a prohibited pig in the eyes of the DNR.

> The Court finds that the lack of notice provided to Mr. Turunen becomes even more obvious in light of the testimony of Mr. Dwayne Etter who, along with Mr. Brian Roell, was one of the DNR employees who inspected and evaluated Mr. Turunen's animals. Mr. Etter advised that a pig could be categorized as Sus scrofa, even if a pig exhibited only one trait which the DNR associates with Russian boar (T-47); and thus, a pig could be ruled prohibited even if it had minimal resemblance to the animal depicted on the DNR's website. Mr. Turunen was never provided by the DNR with any indication as to the number of traits exceeding one that might distinguish a legal pig from an illegal one.

> Because Mr. Turunen was never provided by the DNR with any indication as to the number of traits exceeding one that might distinguish a legal pig from an illegal one, Mr. Turunen could only guess what a DNR examiner might conclude when examining his pigs.

> Mr. Turunen was not provided with the required fair notice as to what specifically could cause a pig to be classified as illegal. The ISO, as applied to Mr. Turunen and his animals, was unconstitutionally vague.

> In addition to its failure to provide Mr. Turunen with fair notice that his eight (8) pigs could be held to be violative of the ISO, the ISO and its lack of a clear

standard regarding enforcement encouraged the subjective application of its provisions. Again, Mr. Turunen would be required to guess as to the number of traits a specific examiner might deem relevant to justify a determination of illegality. The ISO, as applied in this case, impermissibly encouraged arbitrary and discriminatory enforcement, and again, is unconstitutionally vague. See *Van Buren Charter* [*Twp*] *v Garter Belt, Inc*, 258 Mich App 594 (2003); see also *City of Owosso v Pouillon*, 254 Mich App 210 (2002). [(Footnote omitted).]

The circuit court also made specific factual findings with respect to the characteristics of each of the eight prohibited pigs using the photographs of each pig. The court found that defendant did not meet its burden of proof with respect to the illegality of any of the eight pigs.

## II. ANALYSIS

## A. MOOTNESS

We first address an issue not raised by either party, but mentioned by the trial court in its opinion: does the fact that all eight of the pigs identified as potentially unlawful under the ISO are dead make this appeal moot? Mootness, of course, is an issue that courts are obligated to raise on their own throughout the course of the proceedings in order to avoid issuing opinions when there is no longer a controversy between the parties. See *In re MCI Telecom Complaint*, 460 Mich 396, 435 n 13; 596 NW2d 164 (1999) (obligation of court to raise mootness on its own); *Tenneco Inc v Amerisure Mut Ins Co*, 281 Mich App 429, 456; 761 NW2d 846 (2008) (deciding a moot issue is essentially issuing an advisory opinion). The Court in *League of Women Voters of Mich v Secretary of State*, ___ Mich ___, ___; ___ NW2d ___ (2020) (Docket Nos. 160907; 160908), slip op at 22 n 47, recently discussed the mootness doctrine:

As the United States Supreme Court has explained, "[m]ootness has been described as ' "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." ' " *Arizonans for Official English v Arizona*, 520 US 43, 68 n 22; 117 S Ct 1055; 137 L Ed 2d 170 (1997) (citations omitted). Or, as another court put it, "Mootness . . . 'is akin to saying that, although an actual case or controversy once existed, changed circumstances have intervened to destroy standing.' . . . [S]tanding applies at the sound of the starting gun, and mootness picks up the baton from there." *Sumpter v Wayne Co*, 868 F3d 473, 490 (CA 6, 2017) (citation omitted).

The mootness doctrine is not inflexible, as there are several exceptions to the general rule. *United States Parole Comm v Geraghty*, 445 US 388, 404 n 11; 100 S Ct 1202; 63 L Ed 2d 479 (1980). The most frequently cited exception is that a case of public importance, where the remedy requested would be impossible to award because of the passage of time, will still be resolved when the issues are capable of repetition, but evading review. *Taylor v Currie*, 277 Mich App 85, 99; 743 NW2d 571 (2007).

We conclude that the matter before us is not moot. First, in all likelihood the *Turunen I* panel's conclusions on mootness are law of the case, as the pigs at issue were dead at the time of

that appeal as well. *People v Fisher*, 449 Mich 441, 444-445; 537 NW2d 577 (1995); *People v Herrera*, 204 Mich App 333, 340; 514 NW2d 543 (1994). Second, as to the constitutionality of the ISO as applied to plaintiff and these eight pigs, this is not an issue where there is "nothing but abstract questions of law, which do not rest upon existing facts or rights." *Gildemeister v Lindsay*, 212 Mich 299, 302; 180 NW 633 (1920). Instead, the parties continue to actively dispute and litigate the validity of the ISO as applied to plaintiff, and the ISO can still be enforced against plaintiff and his operations. Thus, a live controversy still exists between the parties with respect to the constitutionality of the ISO as applied to these pigs and plaintiff's operations. Third, the fact that the eight pigs at issue are dead does not cause the matter to become moot. For one thing, it is undisputed that plaintiff continues to raise and sell pigs for the main purpose that plaintiff raised and sold the eight dead ones, so even in the absence of these particular pigs the DNR is just as able to take action against plaintiff under the ISO for raising pigs similar to the ones at issue here. Indeed, the DNR refused to dismiss the case earlier in the proceedings because it would not agree to a dismissal with prejudice, as it did not want to foreclose future proceedings. See *Turunen I*, slip op at 7.

In other words, absent a decision on whether the pigs with these or similar characteristics violate the ISO, the parties will not have any legal clarity to guide their relations. As such, a decision on the legality of the eight pigs would have a practical effect on the parties and their rights to future enforcement of the ISO. *Anglers of the AuSable, Inc v Dep't of Environmental Quality*, 489 Mich 884, 884-885; 796 NW2d 240 (2011). The issues are not moot.

## B. AS-APPLIED CHALLENGE TO THE ISO

In the prior appeal, the panel directed that the trial court "shall make such a ruling on the constitutionality of the ISO as applied," and the trial court did so by ruling that the ISO was unconstitutional as applied to plaintiff. We review de novo questions concerning the constitutionality of a statute. *Mich Alliance for Retired Americans v Secretary of State*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 354993); slip op at 6. Statutes are presumed to be constitutional, and a "party challenging the constitutionality of a statute has the burden of proving the law's invalidity." *In re Forfeiture of 2000 GMC Denali and Contents*, 316 Mich App 562, 569; 892 NW2d 388 (2016).

When a vagueness challenge does not involve the First Amendment, "the constitutionality of the statute in question must be examined in light of the particular facts at hand without concern for the hypothetical rights of others." *People v Vronko*, 228 Mich App 649, 652; 579 NW2d 138 (1998). "The proper inquiry is not whether the statute may be susceptible to impermissible interpretations, but whether the statute is vague as applied to the conduct allegedly proscribed in this case." *Id*. Thus, the law required the trial court to consider whether the ISO was vague as applied to plaintiff and his pigs.

"The 'void for vagueness' doctrine is a derivative of the constitutional guarantee that a state may not deprive a person of life, liberty, or property without due process of law." *STC, Inc v Dep't of Treasury*, 257 Mich App 528, 538; 669 NW2d 594 (2003). A challenge to the validity of an ordinance predicated on vagueness invokes constitutional principles of due process. See *John's Corvette Care, Inc v Dearborn,* 204 Mich App 616, 617; 516 NW2d 527 (1994); see also US Const, Am XIV, § 1; Const 1963, art 1, § 17. A statute may be challenged for vagueness on

the grounds that it does not provide fair notice of the conduct proscribed, or that it is so indefinite that it invites arbitrary or discriminatory enforcement. See *Hill v Colorado*, 530 US 703, 732; 120 S Ct 2480; 147 L Ed 2d 597 (2000) and *People v Sands*, 261 Mich App 158, 161; 680 NW2d 500 (2004).

Fair or proper notice exists if the statute gives a person of ordinary intelligence a reasonable opportunity to know what is prohibited. *Kenefick v Battle Creek*, 284 Mich App 653, 655; 774 NW2d 925 (2009). A statute is sufficiently definite if its meaning can be "fairly ascertain[ed] by reference to judicial interpretations, the common law, dictionaries, treatises, or the commonly accepted meanings of words." *Sands*, 261 Mich App at 161. In *Johnson*, 310 Mich App at 658-659, this Court held that "[t]he ISO's delineation of the species declared invasive leaves little to the imagination. . . . The lines drawn in the ISO between protected and prohibited pigs are neither elusive nor uncertain, and suffice to provide fair notice to swine owners of ordinary intelligence. No more is required." This holding established the law of the case with respect to the ISO language and the fair notice element of the void-for-vagueness doctrine.[1] Additionally, plaintiff testified in his deposition that he was breeding his pigs for characteristics that he knew were characteristics of prohibited pigs. Even under these different facts, plaintiff failed to establish that the ISO did not provide fair notice of the type of pigs prohibited by the ISO.

With respect to the second way in which a void-for-vagueness challenge can be made, a statute is unconstitutionally vague if it contains inadequate standards to guide those charged with its enforcement, or if it impermissibly gives the trier of fact unstructured and unlimited discretion in applying the law. *People v Douglas*, 295 Mich App 129, 138; 813 NW2d 337 (2011). This Court previously stated in *Johnson*, 310 Mich App at 657:

> "Due process requires that a State provide meaningful standards to guide the application of its laws." *Pacific Mut Life Ins Co v Haslip*, 499 US 1, 44; 111 S Ct 1032; 113 L Ed 2d 1 (1991) (O'CONNOR, J., dissenting). Void-for-vagueness tenets embrace the principle that a law is unconstitutional "if its prohibitions are not clearly defined." *Grayned v City of Rockford*, 408 US 104, 108; 92 S Ct 2294; 33 L Ed 2d 222 (1972). The Supreme Court explained:
>
> > Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing

---

[1] In *Johnson*, 310 Mich App at 650, this Court considered whether the ISO was unconstitutionally vague as applied to facts as they existed at that point in time—where plaintiffs conceded that their animals were Sus scrofa prohibited under the ISO. But in *Turunen I*, unpub op at 4, the panel concluded that the facts on remand at the time of the bench trial on defendant's counterclaim were not substantially the same as they were at the time the *Johnson* Court remanded the matter because plaintiff no longer owned the pigs that were at issue. Accordingly, the law-of-the-case doctrine does not preclude plaintiff's as-applied constitutional challenge on vagueness grounds as to these eight pigs, though it certainly has an impact on its success.

fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. [*Id*. at 108-109 (citations omitted).]

And, in *Kolender v Lawson*, 461 US 352, 357; 103 S Ct 1855; 75 L Ed 2d 903 (1983), the Court said that it had recently recognized, in the context of a penal statute, that "the more important aspect of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.' " (Citation omitted.)

Here, plaintiff argues that he was subject to subjective, arbitrary, and discriminatory enforcement of the ISO because it lacked explicit standards for determining whether an animal was prohibited by the ISO, and therefore, the DNR agents had unfettered discretion to determine whether the pigs were prohibited. The circuit court found that "the ISO and its lack of a clear standard regarding enforcement encouraged the subjective application of its provisions. Again, Mr. Turunen would be required to guess as to the number of traits a specific examiner might deem relevant to justify a determination of illegality."

The *Johnson* Court's conclusion that the language of the ISO is "neither elusive nor uncertain" makes a challenge to the ISO on the grounds that it encourages arbitrary or discriminatory enforcement difficult. *Johnson*, 310 Mich App at 659. The ISO prohibits possession of Sus scrofa or Sus scrofa hybrids. Part 413 of NREPA requires that the DNR provide "[a] list of prohibited species and restricted species along with a description and a photograph or drawing of each of those species." MCL 324.41313(c). The evidence produced at trial demonstrated that the DNR complied with this requirement. The DNR website provided a color photograph of a prohibited pig, and also identified the following distinguishing features of the invasive species: white tipped bristles, erect ears, straight facial profile, dark distal portions (legs, ears, snout, tail), light colored underfur, and hair colored variations of wild/grizzled, solid black, solid red/brown, black and white spotted, and black and red/brown spotted.

The DNR experts, Etter and Roell, testified that Sus scrofa and Sus scrofa hybrids had certain characteristics, which were available on the DNR website as well as in numerous field guides, and that they applied these characteristics when determining whether an animal was prohibited under the ISO. Both experts testified that they would not find an animal to be prohibited on the basis of only one characteristic, and that they used all information available, together with the combined characteristics of the animal as a whole, in making the determination whether an animal was an invasive species under the ISO. The use of phenotypic characteristics was an acceptable—and the only—means available at the time of trial to determine whether an animal was an invasive species. The ISO clearly provided standards for determining what constituted an invasive species and was not so indefinite that it invited arbitrary or discriminatory enforcement.

-10-

Upon de novo review, we hold that plaintiff failed to sustain his burden of proving that the ISO was unconstitutionally vague as applied to him.[2]

The trial court's rationale in reaching the opposite conclusion was based on the high number of characteristics utilized by the DNR to identify Sus scrofa, in addition to the subjective application of one or all of the characteristics to the animals in question. But the *Johnson* Court had already determined that these criteria were not so unclear as to be facially void for vagueness, but rather, provided fair notice of what was prohibited to pig owners (and presumably the DNR) of ordinary intelligence. *Johnson*, 310 Mich App at 658-659. Additionally, as applied to *these* eight pigs, the DNR witnesses relied upon several of the listed characteristics as to each pig when opining as to why these eight pigs were unlawful under the ISO. Thus, although the application of the criteria is somewhat subjective and may vary pig by pig, as applied to these pigs the standards employed by the DNR were not unconstitutionally void.[3]

## C. THE LEGALITY OF THE PIGS

Turning now to the trial court's determination that the eight pigs were not prohibited by the ISO, the DNR argues that the trial court's factual findings were in error because defendant presented overwhelming evidence that each of the eight pigs were prohibited under the ISO. In support, the DNR points out that the trial court did not discuss the credibility of the witnesses' testimony or the weight it was giving to their testimony, and did not point to any contrary evidence that was more credible or outweighed the evidence presented by it.

It is true, as argued by the DNR, that the trial court did not specifically address one way or the other the testimony of the three DNR experts (Etter, Roell, and Steibel) explaining which phenotypic characteristics of Sus scrofa or Sus scrofa hybrids were common in Sus scrofa but not in Sus domestica. Etter and Roell also testified that in September 2016, they personally observed the animals and took the photographs of the eight pigs that were admitted as exhibits. Additionally,

---

[2] Plaintiff also argues that the ISO is unconstitutional as applied because it violates procedural and substantive due process. Although plaintiff raised these arguments in his brief on remand, the *Turunen I* Court remanded the matter to the trial court for a finding of whether the ISO was void for vagueness as applied, and the trial court's opinion after remand addressed only the void-for-vagueness doctrine. Additionally, plaintiff has not filed a cross-appeal with respect to the circuit court's opinion after remand. Thus, although an appellee who has taken no cross-appeal may still urge in support of the favorable judgment reasons that were rejected by a lower court, *Burns v Rodman*, 342 Mich 410, 414; 70 NW2d 793 (1955), we will not do so here because plaintiff presents arguments on constitutional issues that were not ruled upon by the circuit court and which were outside the scope of this Court's remand.

[3] We note that it was not Etter's testimony that only one trait was sufficient to classify a pig as wild boar or hybrid. Rather, when asked how many characteristics were needed to classify a pig as prohibited, Etter answered, stating the obvious, "at least one[.]" He then almost immediately testified that there was no one controlling characteristic, and he had *never* found an animal to be prohibited based on a single characteristic. Roell also testified that he had *never* identified an animal as prohibited based on one characteristic.

-11-

they testified about each animal, reviewing the photographs of the animals and identifying the Sus scrofa characteristics they had personally observed.

The trial court, in essence, performed the same analysis, as it made factual findings by applying the phenotypic characteristics, including those identified by the DNR on its website and those in the rescinded DR and identified as common characteristics of Sus scrofa by the DNR's experts, to the photographs of each of the eight pigs. On the basis of its examination of the characteristics of each pig, the trial court found that the DNR did not prove by a preponderance of the evidence that the eight pigs were prohibited under the ISO. It was likewise free to utilize the criteria testified to by the DNR experts and independently apply those to the characteristics exhibited in the pictures of the eight pigs. For, as the finder of fact, the trial court was free to accept or reject any part of defendant's witnesses' testimony. MCR 2.613(C). The court was also not required to explain why it did not adhere to the conclusions of a particular witness. Thus, the fact that the trial court did not adhere to or otherwise make findings consistent with the DNR expert witnesses' testimony—even if that testimony was not disputed—is of no moment. *People v Jackson*, 390 Mich 621, 624-625 & 625 n 2; 212 NW2d 918 (1973) ("The trier of fact was not obliged to believe Lewis's testimony simply because it was not contradicted by another witness"). Instead, giving the trial court's factual findings the "great deference" they are due, and given that the trial court was "in a better position to examine the facts," and applied the appropriate factors in determining whether any of the pigs fell within the parameters of the ISO, we cannot conclude that the trial court's findings were clearly erroneous.

The DNR also argues that the circuit court's finding that it failed to prove by a preponderance of the evidence that the eight pigs were prohibited under the ISO is contrary to the court's findings that each pig possessed some characteristics of Sus scrofa. However, the DNR's experts acknowledged that a determination whether a pig is prohibited must be made on the basis of the sum of the phenotypic traits of each pig—which is precisely the approach that the circuit court took. Those same experts recognized that even though a pig may have characteristics of Sus scrofa, not all pigs exhibiting such traits are prohibited under the ISO. Indeed, the experts testified that they would err in favor of an owner if they could not conclusively determine that an animal was prohibited.

## III. CONCLUSION

For these reasons, we reverse the trial court's order holding that the ISO as applied to plaintiff is unconstitutionally vague, but affirm the ultimate judgment in favor of plaintiff on the counterclaim. No costs to either side, neither having prevailed in full.

/s/ Christopher M. Murray
/s/ Michael J. Kelly
/s/ Michelle M. Rick

-12-