*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

METAMORA TOWNSHIP,

      Plaintiff/Counterdefendant/Intervening
      Defendant-Appellee,

and

AJAX PAVING INDUSTRIES,

      Intervening Plaintiff,

v

AMERICAN AGGREGATES OF MICHIGAN,
INC.,

      Defendant/Counterplaintiff-Appellant,

and

EDWARD C. LEVY COMPANY,

      Defendant,

and

GREAT LAKES COUNCIL, INC., and BOY
SCOUTS OF AMERICA,

      Counterplaintiffs-Appellants,

and

METAMORA LAND PRESERVATION
ALLIANCE,

      Intervening Defendant-Appellee,

UNPUBLISHED
April 1, 2021

No. 349069
Lapeer Circuit Court
LC No. 16-050028-CH

-1-

and

ATTORNEY GENERAL,

        Intervening Defendant.

_____

Before:  O'BRIEN, P.J., AND BECKERING AND CAMERON, JJ.

PER CURIAM.

Counterplaintiffs American Aggregates of Michigan, Inc. (AAOM), Great Lakes Council, Inc. (GLC), and Boy Scouts of America appeal the trial court's orders granting summary disposition in favor of plaintiff/counterdefendant Metamora Township and intervening party Metamora Land Preservation Alliance (MLPA), under MCR 2.116(C)(8) (failure to state a claim for relief) and (C)(10) (no genuine issue of material fact) regarding counterplaintiffs' counterclaims.  We affirm.

## I.  BACKGROUND

This action arises from AAOM's application to operate a gravel mine on property that it owned and on property that it leased from Boy Scouts of America in the Township. Counterplaintiffs challenge the validity of a zoning ordinance, which governs the procedure for review and approval of mining permit applications.  Counterplaintiffs also challenge a moratorium that the Township imposed in the months before the challenged ordinances were enacted, as well as the trial court's decision to enter a status quo order at the beginning of the proceeding.

A brief summary of the historical underpinnings of a municipality's authority to regulate mining activity will be helpful.  In *Silva v Twp of Ada*, 416 Mich 153, 156; 330 NW2d 663 (1982), our Supreme Court "reaffirm[ed] the rule of *Certain-teed Prod Corp v Paris Twp*, 351 Mich 434; 88 NW2d 705 (1958), that zoning regulations which prevent the extraction of natural resources are invalid unless 'very serious consequences' will result from the proposed extraction."  The *Silva* Court held that "the important public interest in extracting and using natural resources" justified application of "a more rigorous standard of reasonableness when the zoning would prevent the extraction of natural resources."  *Silva*, 416 Mich at 158-159.  The Court stated that a zoning restriction against extraction of minerals is more onerous than other prohibitions because "[n]atural resources can only be extracted from the place where they are located and found.  Preventing the mining of natural resources located at a particular site prevents all use of those natural resources." *Id*. at 159-160.  Thus, unlike "an ordinance prohibiting manufacturing or commercial business in a residential district that may be conducted in another locality with equal profit and advantage," a restriction against natural resource extraction "wholly deprives the owner of land of its valuable mineral content."  *Id*. at 160 (quotation marks and citation omitted).  The Court's decision in *Silva* was not based on zoning enabling statutes, but on common-law principles regarding the reasonableness of zoning ordinances.

Our Supreme Court later overruled *Silva* in *Kyser v Kasson Twp*, 486 Mich 514, 517; 786 NW2d 543 (2010), on the grounds that "the rule of *Silva*" violated the constitutional separation of powers and was superseded by the Michigan Zoning Enabling Act (ZEA), MCL 125.3101 *et seq*. The *Kyser* Court recited principles supporting deference to local governments' zoning authority, but also noted that "the local power to zone is not absolute." *Id*. at 520-521. The Court recognized that the Due Process Clause of the Michigan Constitution, Const 1963, art 1, § 17, protects interested parties from land use regulations that are not reasonably related to permissible legislative objectives. *Kyser*, 486 Mich at 521. The *Kyser* Court stated that, "[w]hen the individual interest concerns restrictions on the use of property through a zoning ordinance, the question is whether the power, as exercised, involves an undue invasion of private constitutional rights without a reasonable justification in relation to the public welfare." *Id*. (quotation marks and citations omitted).

The *Kyser* Court reviewed the history of the "very serious consequences" rule enunciated in *Silva* and in prior cases. *Id*. at 522-529. The *Kyser* Court noted that "[w]hile the 'no very serious consequences' rule may have originated . . . as a factor to consider in determining the reasonableness of a zoning ordinance, its later applications were not based on traditional due process considerations." *Id*. at 529. The *Kyser* Court observed that "[a]s the [no very serious consequences] rule evolved, it has become progressively more difficult for a local government to regulate the extraction of natural resources by zoning ordinances." *Id*.

After concluding that the "no very serious consequences" rule was not "simply a variation upon the 'reasonableness' test" for determining due process violations, the *Kyser* Court held that "the rule is not a constitutional requirement." *Id*. at 534. Addressing the complications inherent to requiring courts to determine whether "very serious consequences" justified a municipality's legislative zoning decision, the *Kyser* Court concluded that the rule "compels the judiciary to interject itself inappropriately by second-guessing these legislative decisions," and therefore, was "incompatible with the constitutional separation of powers." *Id*. at 535-539. Finally, after analyzing the ZEA, the Court concluded:

> [t]hus, the ZEA is a comprehensive law that empowers localities to zone, sets forth in detail the development of zoning plans within a community, and specifically limits the zoning power in particular circumstances. The Legislature clearly intended for localities to regulate land uses, including the extraction of natural resources other than oil and gas. Under the ZEA, a locality may not totally prohibit a lawful land use within its jurisdiction, providing that there is a demonstrated need for that land use and there is an appropriate location. By contrast, the "no very serious consequences" rule allows natural resources extraction without consideration of these same factors. Under the ZEA, the Legislature requires localities to establish comprehensive land-use plans. The "no very serious consequences" rule, however, dilutes this achievement by overlaying on the law a judicially created case-by-case rule that is incompatible with the idea of a sustained and comprehensive long-term plan. And unlike the ZEA, the "no very serious consequences" rule dictates that a single consideration, the extraction of natural resources, will always carry the highest priority in the land-use process, no matter how this is viewed by the community in which the use occurs, and no matter how thorough and how nuanced the local land-use plan is in reconciling the full range

of relevant factors and interests. The *Silva* rule creates a "one-size fits all" policy in a realm in which it is especially important that the unique circumstances of each locality be carefully assessed. In at least these ways, the "no very serious consequences" rule is, in our judgment, incompatible with the ZEA, and accordingly it is superseded by the ZEA. [*Kyser*, 486 Mich at 543.]

On July 20, 2011, the Legislature enacted 2011 PA 113, which amended MCL 125.3205 ("§ 205")[1] of the ZEA, by adding these provisions:

(3) An ordinance shall not prevent the extraction, by mining, of valuable natural resources from any property unless very serious consequences would result from the extraction of those natural resources. Natural resources shall be considered valuable for the purposes of this section if a person, by extracting the natural resources, can receive revenue and reasonably expect to operate at a profit.

(4) A person challenging a zoning decision under subsection (3) has the initial burden of showing that there are valuable natural resources located on the relevant property, that there is a need for the natural resources by the person or in the market served by the person, and that no very serious consequences would result from the extraction, by mining, of the natural resources.

(5) In determining under this section whether very serious consequences would result from the extraction, by mining, of natural resources, the standards set forth in *Silva v Ada Township*, 416 Mich 153 (1982), shall be applied and all of the following factors may be considered, if applicable:

(a) The relationship of extraction and associated activities with existing land uses.

(b) The impact on existing land uses in the vicinity of the property.

(c) The impact on property values in the vicinity of the property and along the proposed hauling route serving the property, based on credible evidence.

(d) The impact on pedestrian and traffic safety in the vicinity of the property and along the proposed hauling route serving the property.

(e) The impact on other identifiable health, safety, and welfare interests in the local unit of government.

(f) The overall public interest in the extraction of the specific natural resources on the property.

---

[1] In the trial court, the parties and the trial court sometimes referred to 2011 PA 113 and § 205 as the "gravel statute."

In November 2015, AAOM petitioned the Township for conditional rezoning and special land use approval of its owned and leased property. AAOM sought to change the property's zoning classification from recreational to agricultural, with the intent to return the property to recreational use upon completion of its mining project. The mining operation was to take place in five phases, with an expected duration of 30 years. In the application, AAOM noted that "requests" in its application were "being made within a new statutory regime."

On December 14, 2015, the Township Board passed a "Resolution Establishing Moratorium on Gravel Mining Applications in Order to Consider New Statutory Standards." The moratorium reviewed the history of *Silva*, *Kyser*, and 2011 PA 113. The moratorium also quoted the "gravel mining standards" in MCL 125.3205(3) through (5). The Township Board found "that it [was] necessary for the Township to study the [new statutory standards] and consider amending its Zoning Ordinance to accommodate such new standards and procedures[.]" To do so, it imposed a four-month moratorium "on all requests seeking approval of gravel mining in Metamora Township." A resolution extending the moratorium three months beyond its original expiration date of April 14, 2016, was subsequently passed. According to counterplaintiffs, the Township Board considered and granted four petitions from existing mining operations for renewal of their permits while the moratorium was still in effect.

On July 11, 2016, the Township amended its existing zoning ordinance, adding Article 12A ("original Article 12A"). Original Article 12A included Part II, which established a bifurcated procedure for review and approval of applications for mining land use permits. Specifically, Part II created "an administrative review process to determine whether the applicant has demonstrated a sufficient prop[er]ty interest in the natural resource, whether valuable natural resources are located on the applicant's property, and whether there is a need for the natural resource sought to be extracted." Original Article 12A, § 1200A(A). The Planning Commission was to conduct an initial public hearing and then make a recommendation to the Township Board, which was required to "make the final Part II administrative determination." Original Article 12A, § 1200A(A). Applicants who received approval under Part II would then proceed to "Part III for an application for classification of the applicant's property to Transitory Extraction Use Planned Development." Original Article 12A, § 1200A(B). The purpose of this process was "to determine whether the applicant has demonstrated that the applicant's proposed extractive use would result in 'no very serious consequences' as determined under the [ZEA]." Original Article 12A, § 1200A(B). Part III of Article 12A set forth specific standards of review for determining whether an applicant had proved that no very serious consequences would result from the proposed extraction use. These standards were expressed as mandatory requirements, and original Article 12A used phrases such as "shall not" or "shall be." Original Article 12A, § 1205A(D).

On July 19, 2016, the Township filed a cause of action against AAOM. Shortly thereafter, the Township amended its complaint, seeking a temporary injunction holding in abeyance action on AAOM's mining application, a declaration that 2011 PA 113 is invalid, and a permanent injunction barring application of 2011 PA 113 to the Township's consideration of AAOM's application. Counterplaintiffs filed counterclaims, requesting a declaration that original Article 12A was invalid because it exceeded the authority delegated to the Township by the ZEA and because it "unlawfully, arbitrarily, and unreasonably" deprived them of their right to mine valuable natural resources on their property. Counterplaintiffs also alleged that the moratorium, on its face

and as applied, violated their constitutional rights.[2] MLPA was later permitted to intervene in the action. In order "to protect the positions and substantial rights of all the litigants" until their positions could be "fully develop[ed]" and ruled on by the trial court, the trial court precluded the Township from processing and deciding AAOM's application. The trial court dismissed the Township's claims early in the proceeding, but the status quo order remained in effect while counterplaintiffs' counterclaims were litigated.

On March 12, 2018, while the counterclaims were still pending, the Township again amended Article 12A ("amended Article 12A"). In relevant part, Part II included an explanation for the bifurcated review procedure. Amended Article 12A, § 1203A provides, in relevant part, as follows:

> The ZEA authorizes the use of both administrative and legislative review and approval for a planned unit development. MCL 125.3503(7) and (8). The Township Board has determined that it would be inefficient and inappropriate to require an applicant to prepare, and require the Township to review, a complete application seeking a Transitory Extraction Use Planned Unit Development until a determination of the Need for the Natural Resources has been made. Showing such "Need" is referenced in the Gravel Statute to be an *initial burden* that must be met, MCL 125.3205(4). In the adoption of the "no very serious consequences" standard the *Silva* opinion discussed a variable burden of proof depending on public interest[.]
>
> * * *
>
> Accordingly, review of an application to permit a Transitory Extraction Use Planned Unit Development shall begin with a preliminary administrative proceeding in which the applicant must proceed in the sequence specified in MCL 125.3205(4): the initial burden of showing that there are valuable natural resources located on the relevant property, that there is a Need for the natural resources by the person or in the market served by the person. In order to avoid disputes among owners of interests in the property, the applicant shall also demonstrate the sufficiency of [the] applicant's property interest.

Applicants who received approval under Part II proceed to Part III for the determination of "whether no very serious consequences would result from the proposed Transitory Extraction Use Planned Unit Development." Amended Article 12A, § 1205A(A). The standards for the no-very-serious-consequences inquiry were revised to omit the "shall not" and "shall be" language. Instead, amended Article 12A provides that the standards, "as well as all other relevant facts and circumstances," were merely to be considered by the Township. Amended Article 12A, § 1205A(C).

---

[2] Counterplaintiffs also raised other claims, which are not relevant to this appeal.

During the lengthy proceeding, the trial court granted a series of summary disposition motions, ultimately resulting in the dismissal of each of counterplaintiffs' counterclaims. This appeal followed.

## II.  ANALYSIS

## A.  SUMMARY DISPOSITION

This Court "review[s] de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019).

> A motion under MCR 2.116(C)(8) tests the *legal sufficiency* of a claim based on the factual allegations in the complaint. When considering such a motion, a trial court must accept all factual allegations as true, deciding the motion on the pleadings alone. A motion under MCR 2.116(C)(8) may only be granted when a claim is so clearly unenforceable that no factual development could possibly justify recovery.

> A motion under MCR 2.116(C)(10), on the other hand, tests the *factual sufficiency* of a claim. When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ. [*El-Khalil*, 504 Mich at 159-160 (quotation marks and citations omitted).]

This Court reviews de novo questions of law, such as the interpretation of statutes and ordinances. *City of Big Rapids v Brookstone Capital, LLC*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 350746); slip op at 2. This Court also reviews de novo whether a municipal ordinance violates the Constitution. *Bonner v City of Brighton*, 495 Mich 209, 221; 848 NW2d 380 (2014). In doing so, this Court bears in mind that "[t]he decision to declare a legislative act unconstitutional should be approached with extreme circumspection and trepidation[.]" *Id*. The determination whether a party has been afforded due process is a question of law subject to de novo review on appeal. *Elba Twp v Gratiot Co Drain Comm'r*, 493 Mich 265, 277; 831 NW2d 204 (2013).

### 1.  THE RELEVANT ZONING ORDINANCE

As an initial matter, counterplaintiffs argue that the trial court erred by holding that amended Article 12A, as opposed to its original version, was the applicable ordinance. We disagree.

"In determining which version of a zoning ordinance a court should apply, the general rule is that the law to be applied is that which was in effect at the time of decision." In *Landon Holdings, Inc v Grattan Twp*, 257 Mich App 154, 161; 667 NW2d 93 (2003) (quotation marks and citation omitted). The two exceptions to this general rule are when an amendment "would destroy a vested property interest acquired before [the amendment's] enactment," and when "the amendment was enacted in bad faith and with unjustified delay." *Id*. (quotation marks and citation

omitted). Counterplaintiffs did not have a vested property interest that was damaged by amended Article 12A. Therefore, only the bad-faith exception is at issue. "The test to determine bad faith is whether the amendment was enacted for the purpose of manufacturing a defense to [a] plaintiff's suit." *Id*. (alteration, quotation marks, and citation omitted). See also *Grand/Sakwa of Northfield, LLC v Northfield Twp*, 304 Mich App 137, 145; 851 NW2d 574 (2014) (holding that the trial court did not clearly err when finding that bad faith did not exist because "the evidence did not demonstrate that obtaining a litigation advantage was the predominate reason for the ordinance change").

In *Landon Holdings, Inc*, 257 Mich App at 157, the plaintiffs' plan to develop a manufactured housing community on property zoned for agricultural use required both rezoning the property to residential use and a special use permit. The plaintiffs brought suit against the defendant township, challenging the relevant zoning ordinance on statutory and constitutional grounds. *Id*. at 157-158. After the trial court granted summary disposition in favor of the plaintiffs on their statutory claim, the defendant amended its zoning ordinance to create a district in which manufactured housing was allowed without a special use permit. *Id*. at 159-160. The defendant then moved for summary disposition on the plaintiffs' remaining claims, arguing that the amendment of the zoning ordinance rendered the claims moot. *Id*. at 159. The plaintiffs argued that the amendment was made in bad faith "because [the defendant] did not amend its ordinance until after the trial court granted summary disposition to plaintiffs." *Id*. at 165. This Court disagreed, concluding that the "defendant did not violate the ordinance and then attempt to change the ordinance to justify its past behavior." *Id*.

In this case, we conclude that counterplaintiffs failed to establish that the Township adopted amended Article 12A to obtain a litigation advantage. The amendment did not alter the zoning districts. To the extent that the amendment altered the requirements for obtaining approval, the amendment was advantageous to counterplaintiffs because it changed the no-very-serious-consequences standards from mandatory requirements to advisory considerations. Therefore, the amendment was not crafted to satisfy alleged due process or statutory deficiencies without benefiting counterplaintiffs. Although counterplaintiffs point to the fact that the adoption of amended Article 12A removed certain language from original Article 12A, as discussed in detail later in this opinion, the language that counterplaintiffs complain of neither prohibited nor mandated any action. Indeed, the language amounted to nothing more than an expression of opinion that could not, by itself, prove a statutory violation. Accordingly, the trial court did not err by applying amended Article 12A after it was adopted by the Township during the proceeding.

## 2. STATUTORY PREEMPTION

Counterplaintiffs next argue that amended Article 12A is preempted by MCL 125.3205 under a direct conflict theory. We disagree.

"Generally, local governments may control and regulate matters of local concern when such power is conferred by the state. State law, however, may preempt a local regulation either expressly or by implication." *DeRuiter v Twp of Byron*, 505 Mich 130, 140; 949 NW2d 91 (2020). There are two different types of preemption. "Implied preemption can occur when the state has occupied the entire field of regulation in a certain area (field preemption) or when a local regulation directly conflicts with state law (conflict preemption)." *Id*. As relevant to this appeal, "a direct

conflict exists when the ordinance permits what the statute prohibits or the ordinance prohibits what the statute permits." *Id*. (quotation marks and citation omitted).

Whether amended Article 12A directly conflicts with MCL 125.3205 requires an examination of the relevant provisions of the statute and the ordinance.

> The principal goal of statutory interpretation is to give effect to the Legislature's intent, and the most reliable evidence of that intent is the plain language of the statute. When interpreting a statute, we must give effect to every word, phrase, and clause and avoid an interpretation that would render any part of the statute surplusage or nugatory. [*South Dearborn Environmental Improvement Ass'n, Inc, v Dep't of Environmental Quality*, 502 Mich 349, 360-361; 917 NW2d 603 (2018) (quotation marks and citations omitted).]

Moreover, "[n]ontechnical words and phrases should be construed according to their plain meaning, taking into account the context in which the words are used." *Id*. at 361 (quotation marks and citation omitted; alteration in original). "[W]hen there is tension, or even conflict, between sections of a statute, this Court has a duty to, if reasonably possible, construe them both so as to give meaning to each; that is, to harmonize them." *Mays v Snyder*, 323 Mich App 1, 43; 916 NW2d 227 (2018) (quotation marks and citation omitted). We "apply the rules governing statutory interpretation to a municipal ordinance." *City of Big Rapids*, ___ Mich App at ___; slip op at 2.

Counterplaintiffs argue that amended Article 12A is preempted by the current version of § 205, which provides, in pertinent part:

> (3) An ordinance shall not prevent the extraction, by mining, of valuable natural resources from any property unless very serious consequences would result from the extraction of those natural resources. Natural resources shall be considered valuable for the purposes of this section if a person, by extracting the natural resources, can receive revenue and reasonably expect to operate at a profit.

> (4) A person challenging a zoning decision under subsection (3) has the initial burden of showing that there are valuable natural resources located on the relevant property, that there is a need for the natural resources by the person or in the market served by the person, and that no very serious consequences would result from the extraction, by mining, of the natural resources.

Subsection (3) prohibited the Township from adopting an ordinance that prevented "the extraction, by mining, of valuable natural resources from any property unless very serious consequences would result from the extraction of th[e] natural resources."[3] Additionally, subsection (3), by its terms, is limited to "*valuable* natural resources" (emphasis added). Resources

---

[3] See *Wolfenbarger v Wright*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 350668); slip op at 15 (noting that "[t]he use of the word 'shall' denotes mandatory action").

are valuable if a person "can receive revenue and reasonably expect to operate at a profit" from their extraction. MCL 125.3205(3).

Subsection (4) then outlines the procedure for challenging a zoning decision under subsection (3). The person who is challenging the decision has the initial burden of showing (1) "that there are valuable natural resources located on the relevant property," (2) "that there is a need for the natural resources by the person or in the market served by the person," and (3) "that no very serious consequences would result from the extraction, by mining, of the natural resources."

While subsection (3) provides a definition for "valuable," § 205 does not define "need." Because "need" is not defined by the statute, it is appropriate to consult dictionary definitions. *Guardian Environmental Servs, Inc v Bureau of Constr Codes and Fire Safety*, 279 Mich App 1, 6-7; 755 NW2d 556 (2008). "Need" is defined as "a lack of something requisite, desirable, or useful"; "a condition requiring supply or relief[.]" *Merriam-Webster's Collegiate Dictionary* (11th ed). Therefore, in order for natural resources to be needed, the resources must be "requisite, desirable, or useful" and there must be "a lack" of them such that a "supply" is required.

Amended Article 12A established a bifurcated procedure for review and approval of applications for mining permits. Specifically, it provides that an applicant has "the initial burden of showing that there are valuable natural resources located on the relevant property" and "that there is a Need for the natural resources by the person or in the market served by the person." Amended Article 12A, § 1203A. "Need" is defined in amended Article 12A as follows:

> "*Need for the Natural Resources*" ("Need") is used in the Gravel Statute by reference in MCL 125.3205(4) to: "Need for the Natural Resources by the person or in the market served by the person." The intended meaning of "Need" is informed by MCL 125.3205(3), in which it is clarified that for purposes of the Gravel Statute natural resources must be "valuable," meaning that by extracting them a person "can receive revenue and reasonably expect to operate at a profit." Therefore, "Need" shall mean a requirement relating to the commercial market for the natural resources proposed to be excavated on the applicant's property. [Amended Article 12A, § 1202A(A).]

The applicant must "also demonstrate the sufficiency of [the] applicant's property interest" under Part II. Amended Article 12A, § 1203A. Applicants who received approval under Part II proceed to Part III for a determination of "whether no very serious consequences would result from the proposed Transitory Extraction Use Planned Unit Development." Amended Article 12A, § 1205A(A).

We fail to see how amended Article 12A directly conflicts with subsection (4). Indeed, the first two requirements contained in amended Article 12A, § 1203A are identical to the first two requirements contained in subsection (4). Additionally, both place the initial burden on the person seeking to extract natural resources from the property. Although amended Article 12A defines "Need" and subsection (4) does not, we conclude that amended Article 12A's definition is consistent with the dictionary definition. As already discussed, subsection (4) requires that the natural resources be "requisite, desirable, or useful" and that there is "a lack" of them such that a

"supply" is required.  Based on this, it is clear that subsection (4) contemplates commercial market demands, which is entirely consistent with amended Article 12A's definition of "Need."

Counterplaintiffs also take issue with the fact that amended Article 12A, § 1203A requires the Township to consider

> the extent that the natural resources proposed to be extracted can be obtained from other viable sources within the "Commercial Market," i.e., within the geographic area within which there would be a commercial demand for the natural resources from the applicant's property, considering factors including, but not limited to: the transportation expenses and other factors relevant to cost; and the available supply of the natural resources from other properties.

As already stated, subsection (4) specifically requires the challenger of a decision under subsection (3) to establish "that there is a need for the natural resources by the person or *in the market served by the person*" (emphasis added).[4]  Amended Article 12A, § 1203A's requirement that the Township consider whether the natural resources can be provided by another supplier within the geographic region served by the applicant does not conflict with subsection (4).  Rather, it reasonably follows that, if another supplier can provide sufficient amounts of the natural resource to the individuals in that geographic region, there is not a need for the resource.  Because subsection (4) requires that "the market served by the person" seeking to extract natural resources be considered under certain circumstances, we fail to see how geographic regions cannot be contemplated when determining whether there is a "Need" for the resource under the amended ordinance.

Next, counterplaintiffs argue that the Legislature "did not intend to give the municipality quasi-judicial powers to make the needs determination."  Rather, according to counterplaintiffs, "the Legislature expressly reserved that determination for the court[.]"  This argument appears to be based on counterplaintiffs' belief that subsection (4) applies only to appeals of a municipality's zoning decision to a circuit court under MCL 125.3605.  However, subsection (4) does not contain language limiting its application to appeals.  Rather, it applies generally to "challenges," which is a category that could include circuit court appeals *and* appeals to the zoning board of appeals under MCL 125.3604.  Importantly, a zoning board of appeals is a legislative body.  MCL 125.3601.

Even so, counterplaintiffs argue that the Legislature intended for a person challenging a zoning decision to "receive de novo review in a judicial forum which also allows the court to make the further inquiry and findings regarding whether the applicant or the market has a need for the resources."  In so arguing, however, counterplaintiffs fail to explain or rationalize how it would be

---

[4] "The word 'or' generally refers to a choice or alterative between two or more things." *Amerisure Ins Co v Plumb*, 282 Mich App 417, 429; 766 NW2d 878 (2009) (quotation marks and citation omitted).

proper for a reviewing court to make findings of fact, much less to conduct evidentiary hearings, on issues that were not before the decision-making body that made the challenged decision. Consequently, counterplaintiffs' argument that subsection (4) only contemplates judicial review is without merit.

Counterplaintiffs also take issue with the fact that amended Article 12A requires that an applicant "demonstrate the sufficiency of [the] applicant's property interest" under amended Article 12A, § 1203A.[5] While counterplaintiffs are correct that § 205 does not specifically reference property interests, subsection (4) clearly contemplates that a person challenging a zoning decision under subsection (3) must have a property interest in the natural resources. Indeed, in order to establish that a resource is valuable, the person must be able to "receive revenue and reasonably expect to operate at a profit." MCL 125.3205(3). Logic dictates that, in order for an individual to be able to make a profit from extracting the natural resources, the person must have a property interest in the resource. Without a property interest, the individual would not stand to legally gain a profit. Thus, contrary to counterplaintiffs' argument, amended Article 12A does not add additional requirements by requiring that an applicant establish "a sufficient prop[er]ty interest in the natural resource[.]"

Although counterplaintiffs take issue with the fact that amended Article 12A permits the Township to allow the "prohibition of the mining of valuable resources without any finding that very serious consequences would result," this is consistent with subsection (4). As already stated, MCL 125.3205(4) provides as follows:

> A person challenging a zoning decision under subsection (3) has the initial burden of showing that there are valuable natural resources located on the relevant property, that there is a need for the natural resources by the person or in the market served by the person, *and* that no very serious consequences would result from the extraction, by mining, of the natural resources. [Emphasis added.]

The legislature's use of the word "and" establishes that all of the requirements listed in subsection (4) must be met in order for a person to satisfy his or her initial burden when challenging a zoning decision under subsection (3). See *Amerisure Ins Co v Plumb*, 282 Mich App 417, 428; 766 NW2d 878 (2009) ("The term 'and' is defined as a conjunction, and it means 'with; as well as; in addition to[.]' ") (alteration in original; citation omitted.) Therefore, in the event that an applicant cannot establish that the resources are valuable or that there is a need for the resources, it is not necessary under subsection (4) to determine whether "very serious consequences would result[.]" This is entirely consistent with amended Article 12A.

---

[5] Amended Article 12A, § 1202A(B) provides as follows:

> The phrase "sufficiency of applicant's property interest" shall mean a requirement that there shall be written notice to, and consent if feasible to the application with regard to the land which is the subject of the application by all persons who (a) file as applicant, and to the extent relevant, (b) have other possessory ownership interests in the land.

Next, counterplaintiffs argue that "[t]he Ordinance directly conflicts with . . . §205 because it permits—and even in many instances requires—that the Township prevent mining of valuable natural resources even where those consequences fall far short of the 'very serious' standard in [ZEA] §205" (emphasis omitted). MCL 125.3205(5) provides as follows:

> In determining under this section whether very serious consequences would result from the extraction, by mining, of natural resources, the standards set forth in *Silva v Ada Twp*, 416 Mich 153 (1982), shall be applied and all of the following factors may be considered, if applicable:
>
> (a) The relationship of extraction and associated activities with existing land uses.
>
> (b) The impact on existing land uses in the vicinity of the property.
>
> (c) The impact on property values in the vicinity of the property and along the proposed hauling route serving the property, based on credible evidence.
>
> (d) The impact on pedestrian and traffic safety in the vicinity of the property and along the proposed hauling route serving the property.
>
> (e) The impact on other identifiable health, safety, and welfare interests in the local unit of government.
>
> (f) The overall public interest in the extraction of the specific natural resources on the property.

Thus, MCL 125.3205(5) requires consideration of the standards set forth in *Silva* and permits the factors outlined in MCL 125.3205(5)(a) through (f) to be considered. See *Walters v Nadell*, 481 Mich 377, 383; 751 NW2d 431 (2008) (noting that the term "may" generally designates discretion). Counterplaintiffs note that the factors listed in Article 12A are mandatory, as opposed to discretionary. The standards that counterplaintiffs complain of, however, are stated as requirements in the original Article 12A, but were reworded as factors for consideration in amended Article 12A.

Specifically, Part III of original Article 12A set forth specific standards of review for determining whether the applicant proved that no very serious consequences would result from the proposed extraction. These were grouped under the headings "Existing Land Uses," "Property Values," "Pedestrian and Traffic Safety," "Identifiable Health, Safety, and Welfare Interests," and "Overall Public Interest in the Proposed Extraction." Original Article 12A, § 1205A(D). Under

each heading was a list of factors for the Township to consider. These standards were expressed as mandatory requirements.[6] The following is an example from original Article 12A:

1. Existing Land Uses

   a. The relationship of applicant's proposed Transitory Extraction Use and associated activities with existing land uses anticipated to be impacted *shall not* produce unreasonable or inequitable results;

   b. The impact of applicant's proposed Transitory Extraction Use and associated activities on existing land uses in the vicinity of the property *shall not* produce unreasonable or inequitable results;

   c. The proposed Transitory Extraction Use, including haul route, *shall* be capable of being designed, located, planned and operated so that . . . the public health, safety and welfare *shall not* be protected in relation to existing land uses, and that the proposal will achieve such results. [Original Article 12A, § 1205A(D)(1) (emphasis added).]

In contrast, amended Article 12A sets forth "Guiding Standards of Review for Township Legislative Consideration." Amended Article 12A states:

   The following guiding standards are provided. These standards are presented within the framework provided in MCL 125.3205(5)(a)-(f) for the purpose of determining whether the applicant has proven that "no very serious consequences" would result from the applicant's proposed Transitory Extraction Use and associated activities and haul route. These standards are intended to assist the Township in reviewing an application under the Gravel Statute, and shall be considered by the Planning Commission and Township Board in deliberating on the application, and shall guide decision making on the Township Board's ultimate legislative decision on whether the applicant has proven that "no very serious consequences" would result from the applicant's proposed Transitory Extraction Use and associated activities and haul route. The weight and relevance of each of these standards shall be determined by the Township Board, in its discretion, taking into consideration the extent of Need and public interest in the specific resources on applicant's property, as well as all other relevant facts and circumstances. [Amended Article 12A, § 1205A(C).]

The amended ordinance reworded the requirements in the original ordinance as factors to be considered. For example, under the heading "Existing Land Uses," the relevant factors are listed

---

[6] The trial court erred by characterizing the factors in original Article 12A as advisory rather than mandatory. However, the trial court's characterization is accurate in reference to amended Article 12A.

as follows:

    a. The relationship of applicant's proposed Transitory Extraction Use and associated activities with existing land uses anticipated to be impacted;

    b. The impact of applicant's proposed Transitory Extraction Use and associated activities on existing land uses in the vicinity of the property;

    c. The impact upon the public health, safety and welfare from the proposed Transitory Extraction Use, including haul route, considering, among other things, the proposed design, location, layout and operation in relation to existing land uses. [Amended Article 12A, § 1205A(C)(1).]

Consequently, the factors listed in amended Article 12A are merely advisory. Indeed, it appears that the mandatory language was removed from original Article 12A in order to comply with subsection (5), which does not mandate consideration of the listed factors. Furthermore, the headings listed in amended Article 12A are entirely consistent with the factors listed in MCL 125.3205(5)(a) through (f), and the factors under the headings merely serve to provide specific examples for the Township to consider when reviewing a mining application. Importantly, subsection (5) does not provide that only the factors listed therein may be considered.

While Amended Article 12A, § 1205A(C) provides that the factors "shall be considered by the Planning Commission and Township Board in deliberating on the application," amended Article 12A does not mandate that the factors be applied. Additionally, Amended Article 12A, § 1205A(C) provides that the factors should be balanced by the Township Board when it analyzes whether no very serious consequences would result from an extraction. Specifically, the relevant portion of amended Article 12A provides that "[t]he weight and relevance of each of these standards shall be determined by the Township Board, in its discretion, taking into consideration the extent of Need and public interest in the specific resources on applicant's property, as well as all other relevant facts and circumstances." Thus, the plain language of amended Article 12A establishes that an applicant's failure to satisfy one of the factors listed in amended Article 12A would not result in a denial of an application. This is consistent with subsection (5).

Counterplaintiffs also argue that Article 12A admits in its own language that it is in conflict with the ZEA. Specifically, counterplaintiffs point to the following provision:

In light of the fundamental issues . . . relating to a literal reading of the Silva Standard, the courts may ultimately find the Gravel Statute invalid and unauthorized. In the meantime, the Township must attempt to exercise its zoning authority in the manner provided by existing law. In this regard, the Township has concluded that the only permissible exercise of zoning authority that could provide a reconciliation of a literal reading of the Gravel Statute with the ZEA as a whole, and with the common law of zoning, is an invocation of the planned unit development. . . . For the reasons spelled out . . . above, the Gravel Statute standing alone fails to provide an express reconciliation with the ZEA as a whole, or with the common law of zoning under the judicially established standard of Due Process. [Original Article 12A § 1204A(F).]

This language was contained in original Article 12A. However, the allegedly objectionable language was omitted from amended Article 12A, which is the ordinance that is relevant to the issues on appeal. Moreover, this language merely expressed the Township's opinion about § 205. Despite expressing concern, the Township acknowledged that it "must attempt to exercise its zoning authority in the manner provided by existing law." Therefore, because the language did not require or prohibit any action, it could not affect the Township's decisions.

Finally, counterplaintiffs take issue with amended Article 12A's bifurcated review procedure. However, § 205 does not provide procedural rules for a municipality's review of mining applications. Section 205 neither authorizes nor prohibits a municipality from using a bifurcated procedure. Instead, the statute is silent on the issue. As already discussed at great length, the procedure adopted by the Township in amended Article 12A is consistent with the mandates contained in subsections (4) and (5). Thus, we conclude that the bifurcated procedure contained in amended Article 12A does not directly conflict with § 205.

In sum, we conclude that amended Article 12A does not directly conflict with MCL 125.3205 and is therefore not preempted by the statute. Consequently, the trial court did not err by granting summary disposition on counterplaintiffs' statutory preemption claim.

## 3. ULTRA VIRES ACTION

Counterplaintiffs next argue that amended Article 12A is invalid because it is ultra vires, i.e., beyond the scope of the authority delegated to the Township in the ZEA. We disagree.

"Municipalities have no inherent power to regulate land use through zoning." *Ansell v Delta Co Planning Comm*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 345993); slip op at 4 (quotation marks and citation omitted). Rather, "[z]oning constitutes a legislative function. The Legislature has empowered local governments to zone for the broad purposes identified in MCL 125.3201(1)." *Kyser*, 486 Mich at 520 (citation and footnote omitted). Because municipalities have no inherent zoning power, they can only exercise zoning authority that the State has delegated to them through enabling legislation. *Whitman v Galien Twp*, 288 Mich App 672, 679; 808 NW2d 9 (2010).

A majority of counterplaintiffs' arguments on appeal with respect to this issue center around counterplaintiffs' belief that the Township did not wish to comply with the requirements of § 205 and that the Township essentially "rewrote" the statute. However, for the reasons already discussed above, amended Article 12A does not conflict with § 205. Indeed, the amended ordinance is consistent with the plain language of the statute. Furthermore, although original Article 12A expressed concern that § 205 may be deemed invalid in the future, the language was removed from amended Article 12A, which is the version of the ordinance that is to be applied when considering counterplaintiffs' arguments on appeal. Thus, contrary to counterplaintiffs' argument, the Township did not "evade the Legislature's mandate."

Counterplaintiffs also argue that amended Article 12A is invalid because the Township failed to zone land for "heavy industrial use" in the Township Master Plan. To the extent that counterplaintiffs argue that the Township's actions exceeded the scope of MCL 125.3203(1), that statute merely states the overall goals of zoning regulations. Specifically, it requires that local

-16-

governments zone in accordance with a broad plan to ensure that multiple interests are served. The statute does not prohibit a local government from enacting a specific amendment to a zoning ordinance without also amending the master plan. There is nothing inherently wrong with the Township's decision to amend its zoning ordinance to accommodate § 205 without disrupting its overall plan. Indeed, as noted by the Township, "[t]he Township cannot set aside specific land for heavy industrial mining in the Master Plan without knowing where mineral deposits exist." It is more reasonable for the Township to wait until it receives and approves an application for extraction of natural resources from the property. See *Landon Holdings, Inc*, 257 Mich App at 172. Consequently, contrary to counterplaintiffs' arguments, the trial court did not "erroneously reject the argument that the Ordinance was ultra vires."

### 4. CONSTITUTIONALITY OF AMENDED ARTICLE 12A—SUBSTANTIVE DUE PROCESS RIGHTS

Counterplaintiffs argue that amended Article 12A violated their right to substantive due process under the United States and Michigan Constitutions. We disagree.

"The Fourteenth Amendment to the United States Constitution and the Const. 1963, art 1, § 17 guarantee that no state shall deprive any person of life, liberty or property, without due process of law." *People v Sierb*, 456 Mich 519, 522; 581 NW2d 219 (1998) (quotation marks and footnote omitted). "The underlying purpose of substantive due process is to secure the individual from the arbitrary exercise of governmental power." *Id*. at 523.

"[A] regulatory action that does not implicate fundamental rights . . . is subject to rational-basis review." *Johnson v Dep't of Natural Resources*, 310 Mich App 635, 650; 873 NW2d 842 (2015). "To prevail . . ., a challenger must show that the legislation is arbitrary and wholly unrelated in a rational way to the objective of the statute." *Id*. at 651 (quotation marks and citation omitted). Specifically, a plaintiff "must establish that no set of circumstances exist under which the [ordinance] would be valid[.]" *Bonner*, 495 Mich at 223 (first alteration in original; quotation marks and citation omitted). "[I]f any state of facts reasonably can be conceived that would sustain [the ordinance], the existence of the state of facts at the time the law was enacted must be assumed and the ordinance upheld." *Id*. (alterations in original; quotation marks and citations omitted).

"Rational-basis review is highly deferential[,]" and its limited scope "reflects the judiciary's awareness that it is up to legislatures, not courts, to decide on the wisdom and utility of legislation." *Johnson*, 310 Mich App at 650 (quotation marks and citation omitted). Consequently, "only in rare and exceptional cases will rational-basis review result in invalidating a law." *Id*. at 651.

Counterplaintiffs argue that Article 12A does not reasonably advance a governmental interest because it arbitrarily restricts natural resource extraction. Counterplaintiffs identify three allegedly irrational aspects of Article 12A: (1) the Township's imposition of 39 standards to prove the absence of "very serious consequences," (2) the Township's imposition of standards that differ from the statutory standards, and (3) the Township's bifurcated approval process.

The 39 standards that counterplaintiffs complain of are stated as requirements in the original Article 12A. As already discussed, in amended Article 12A, the Township reworded the

factors, changing them from mandatory considerations to merely factors for consideration. Consequently, the factors listed in amended Article 12A are advisory and are consistent with the factors listed in MCL 125.3205(5)(a) through (f). Furthermore, each of the factors in amended Article 12A contain detailed considerations for the Township Board or the Planning Commission to consider when making a no-very-serious-consequences determination. As noted by the Township, this was done to aid in decision making given that members of the Township Board may not have a legal background and/or may need assistance with determining the meaning of no very serious consequences. The requirement that the factors contained in Amended Article 12A, § 1205A(C) be considered also ensures that similar inquiries are made with respect to each mining application. Therefore, we fail to see how the Township's decision to include additional standards concerning the no-very-serious-consequences inquiry was arbitrary or unrelated to the Township's goal of ensuring that mining applications are considered in accordance with the applicable law.

Next, counterplaintiffs claim that the requirement in amended Article 12A that an applicant must demonstrate a sufficient property interest is irrational. Counterplaintiffs do not explain or rationalize in a meaningful manner why requiring an applicant to establish that he or she has an adequate interest in the natural resources that he or she seeks to extract is arbitrary. Rather, such a requirement prevents an individual who lacks a sufficient property interest in the natural resources from being provided with a mining permit. Indeed, Amended Article 12A, § 1202A(B) provides that "[t]he purpose of this requirement is to avoid a dispute with regard to whether the applicant is authorized to make application and conduct an extraction operation if approved under this Article 12A." We fail to see how the Township's decision to require the applicant to "demonstrate the sufficiency of [the] applicant's property interest" is arbitrary or unrelated to the Township's goal of ensuring that mining applications are considered in accordance with the law. The requirement also advances the goal of protecting the property interests of the Township's citizens.

Finally, counterplaintiffs' argue that the bifurcated approval procedure violates substantive due process. This argument is also without merit. If an applicant is unable to establish the required property interest or "Need" under Amended Article 12A, § 1203A, then it would be unnecessary to complete the no-very-serious-consequences analysis. As demonstrated by the factors contained in Amended Article 12A, § 1205A(C), this is a fact-intensive inquiry that likely requires a substantial amount of time and resources. It would be entirely reasonable for the Township to want to complete the relatively uncomplicated determinations concerning property interests and "Need" before addressing the more onerous question of whether no very serious consequences would result from the extraction of natural resources. Importantly, counterplaintiffs do not explain how this bifurcated procedure lacks a rational relationship to the legitimate governmental goal of preserving Township resources while also efficiently considering mining applications.

Because we discern no substantive due process violation, we conclude that the trial court did not err by granting summary disposition on this claim.[7] In so holding, we note that

---

[7] Although counterplaintiffs' statement of this issue also suggests that they are raising an equal-protection challenge, they do not present any argument that amended Article 12A violates their constitutional rights to equal protection, thereby abandoning any such claim. *Seifeddine v Jaber*,

-18-

counterplaintiffs argue that amended Article 12A "fails to advance a legitimate public purpose" because it was designed to "stop the mine." To support this argument, counterplaintiffs note that the Township admitted that it did not contemplate amending the zoning ordinance until AAOM submitted its gravel mining application. However, "because facial attacks, by their nature, are not dependent on the facts surrounding any particular decision," the facts surrounding counterplaintiffs' claims are inapposite. See *Bonner*, 495 Mich at 223.

## 5. LEGALITY OF THE MORATORIUM

Counterplaintiffs argue that the moratorium was not a proper exercise of the Township's authority because it was an illegal attempt to amend its zoning ordinance by resolution and because passing moratoria is not authorized by the ZEA. We disagree.

"An ordinance or resolution cannot be amended, repealed, or suspended by another act by a council of less dignity than the ordinance or resolution itself." *McCarthy v Village of Marcellus*, 32 Mich App 679, 688-689; 189 NW2d 80 (1971). "[T]he difference between municipal ordinances and resolutions is in what the actions do, rather than in the manner in which they are passed. Resolutions are for implementing ministerial functions of government for short-term purposes. Ordinances are for establishing more permanent influences on the community itself." *Rollingwood Homeowners Corp v City of Flint*, 386 Mich 258, 264; 191 NW2d 325 (1971) (quotation marks and citation omitted). "Normally when faced with the fact of a resolution passed by a city government in an area where an ordinance is required, this Court would respond by declaring the resolution void." *Id*. (quotation marks and citation omitted).

In this case, the moratorium was approved for an initial four-month period and then later extended by three months, clearly making it temporary and short-term. Furthermore, the moratorium did not establish a procedure for reviewing petitions for mining approval, but rather delayed consideration of petitions until the Township could study the applicable statutory standards and procedures for processing and considering requests for approval of gravel mining in Metamora Township. Thereafter, the Township duly adopted original Article 12A, which prescribed the requirements and procedures for obtaining approval of a gravel mining application. The moratorium did not deny counterplaintiffs a right to apply for a mining permit, but merely temporarily delayed a decision on applications until the Township could study and determine how such applications were required to be reviewed under evolving statutory standards. Because the moratorium did not establish any permanent changes or alter the way that applications were decided, we conclude that the moratorium did not operate as a de facto ordinance.

Counterplaintiffs also argue that the ZEA "is the Township's sole source of zoning authority, and it establishes interim zoning—not moratoria—as the sole means to delay reviewing and granting land use applications that a municipality would otherwise be required to process." In so arguing, however, counterplaintiffs do not specifically cite to a portion of the ZEA to support their position. Instead, counterplaintiffs cite *Lake Twp v Sytsma*, 21 Mich App 210; 175 NW2d

---

327 Mich App 514, 520; 934 NW2d 64 (2019) ("Failure to adequately brief an issue constitutes abandonment.").

337 (1970), which is not binding precedent and is factually distinguishable from the facts herein. MCR 7.215(J)(1). Consequently, because counterplaintiffs' argument that the moratorium was not authorized by the ZEA is unsupported, we conclude that the trial court did not err by granting summary disposition on this claim.[8]

## 6. CONSTITUTIONAL ISSUES PERTAINING TO THE MORATORIUM

Counterplaintiffs argue that the moratorium violated their rights under the Due Process and Equal Protection Clauses of the United States and Michigan Constitutions. We disagree.

### a. DUE PROCESS RIGHTS

"The Fourteenth Amendment to the United States Constitution and the Const. 1963, art 1, § 17 guarantee that no state shall deprive any person of life, liberty or property, without due process of law." *Sierb*, 456 Mich at 522 (quotation marks and footnote omitted). "Due-process guarantees apply to any adjudication of important rights. These protections apply to vested property interests." *Souden v Souden*, 303 Mich App 406, 413; 844 NW2d 151 (2013). "A protected property interest is present where an individual has a reasonable expectation of entitlement deriving from existing rules or understandings that stem from an independent source such as state law." *Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 209; 761 NW2d 293 (2008) (quotation marks and citation omitted).

In this case, counterplaintiffs argue that the moratorium and the subsequent extension of the moratorium resulted in a violation of their due process rights. Specifically, counterplaintiffs argue that they "have a clear protected liberty or property interest in the timely and unbiased review of a petition related to the development or use of real property." However, counterplaintiffs set forth no authority to establish that they have a protected interest in having their mining application considered within seven months of being submitted. "An appellant may not merely announce a position then leave it to this Court to discover and rationalize the basis for the appellant's claims; nor may an appellant give an issue only cursory treatment with little or no citation of authority." *Cheesman v Williams*, 311 Mich App 147, 161; 874 NW2d 385 (2015) (citation omitted). Accordingly, this argument is abandoned. See *id*.

To the extent that this argument is based on counterplaintiffs' belief that the immediate consideration of the application would have led to the Township being required to grant AAOM the requested mining permit, counterplaintiffs have failed to establish that AAOM had a "reasonable expectation of entitlement" to have its application granted. No evidence in the record

---

[8] Counterplaintiffs state in a footnote that if the moratorium was an interim zoning ordinance, it was not passed in compliance with the Open Meetings Act, MCL 15.261 *et seq.* Counterplaintiffs do not explain further how the Open Meetings Act was violated or further develop this argument. "An appellant may not merely announce a position then leave it to this Court to discover and rationalize the basis for the appellant's claims; nor may an appellant give an issue only cursory treatment with little or no citation of authority." *Cheesman v Williams*, 311 Mich App 147, 161; 874 NW2d 385 (2015) (citation omitted). Accordingly, even if the moratorium was a de facto ordinance, this argument would be abandoned. See *id*.

shows that anyone from the Township had told AAOM that the application would be approved. Furthermore, once the application was in the process of being considered, AAOM would undoubtedly be "subject to the inherently unpredictable and often politicized process of seeking permission from a local legislative body to conduct certain activity on a piece of property." See *Mettler Walloon, LLC*, 281 Mich App at 209 (quotation marks and citation omitted). Importantly, AAOM's application has yet to be considered and decided.

In sum, because counterplaintiffs failed to establish that AAOM had a constitutionally protected right to have its application considered in a certain time or had a "reasonable expectation of entitlement" to the permit, the trial court did not err by granting summary disposition on counterplaintiffs' due process claims. See *id*. ("A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution.") (quotation marks and citation omitted).

### b. RIGHT TO EQUAL PROTECTION UNDER THE LAW

"The equal protection clauses of the Michigan and United States constitutions provide that no person shall be denied the equal protection of the law." *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp*, 486 Mich 311, 318; 783 NW2d 695 (2010). The purpose of the equal protection guarantee is to secure every person "against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v Olech*, 528 US 562, 564; 120 S Ct 1073; 145 L Ed 2d 1060 (2000). The level of review in an equal-protection claim depends "on the nature of the alleged classification." *Crego v Coleman*, 463 Mich 248, 283; 615 NW2d 218 (2000) (KELLY, J., dissenting). In this case, it is undisputed that rational basis review applies.

With respect to counterplaintiffs' facial challenge, the Township imposed a four-month moratorium "on *all* requests seeking approval of gravel mining in Metamora Township" (emphasis added). Given that the moratorium provided that "all requests seeking approval of gravel mining" would not be considered until the moratorium expired, we fail to see how AAOM was subjected to intentional and arbitrary discrimination based on the language of the moratorium alone. Indeed, the plain language of the moratorium purports to treat all individuals seeking approval for gravel mining equally. Therefore, counterplaintiffs' facial challenge fails.

Counterplaintiffs also argue that the moratorium was unconstitutional as applied. Specifically, counterplaintiffs allege that the Township's agents considered and granted four petitions from existing mining operations for renewal of their permits while the moratorium was still in effect. Importantly, however, "[t]he constitutional guarantee of equal protection ensures that people similarly situated will be treated alike, but it does not guarantee that people in different circumstances will be treated the same." *Champion v Secretary of State*, 281 Mich App 307, 324; 761 NW2d 747 (2008) (quotation marks, citation, and emphasis omitted). In this case, AAOM and the individuals whose permits were renewed were not similarly situated. Indeed, these individuals had already been granted permits in the past and, presumably, were continuously engaging in mining activities on their respective properties. See e.g., *Maxwell v Dept of Environmental Quality*, 264 Mich App 567, 571-572; 692 NW2d 68 (2004) (holding that, "[o]nce given, a license becomes a protected property interest"). AAOM, as an applicant for a new mining permit, did not have a vested property interest at any relevant time. See *Mettler Walloon, LLC*,

281 Mich App at 209. Therefore, we conclude that the trial court did not err by granting summary disposition on the equal protection claim.

## c. DAMAGES UNDER 42 USC 1983

Counterplaintiffs also argue that this Court should remand this matter to the trial court and order the trial court "to award damages and attorney's fees, in an amount to be determined on remand, for the violations of 42 USC §1983." We conclude that, because counterplaintiffs failed to establish any violation of their constitutional rights, they are not entitled to damages under § 1983. See *Johnson v Vanderkooi*, 502 Mich 751, 762-763; 918 NW2d 785 (2018).

## B. STATUS QUO ORDER

Counterplaintiffs argue that the trial court's status quo order, which was entered during the early stages of this case, was a de facto preliminary injunction requiring compliance with MCR 3.310. The Township tacitly agrees with this characterization, but argues that the trial court substantially complied with the rule. We agree.

"Where a party seeks a preliminary injunction to prevent an alleged status quo violation . . ., the party must satisfy a two-step process." *Detroit Fire Fighters Ass'n, IAFF Local 344 v Detroit*, 482 Mich 18, 34; 753 NW2d 579 (2008). "First, it bears the burden of proving that the traditional four elements favor the issuance of a preliminary injunction." *Id*. The four elements that the trial court must evaluate are:

> (1) [whether] the moving party made the required demonstration of irreparable harm, (2) [whether] the harm to the applicant absent such an injunction outweighs the harm it would cause to the adverse party, (3) [whether] the moving party showed that it is likely to prevail on the merits, and (4) [whether] there will be harm to the public interest if an injunction is issued. [*Id*.]

In this case, the Township's amended complaint sought a temporary injunction holding in abeyance action on counterplaintiffs' mining application, a declaration that 2011 PA 113 is invalid, and a permanent injunction barring application of 2011 PA 113 to the Township's consideration of counterplaintiffs' application. The Township also requested that the trial court issue an order to show cause as to why the relief outlined in the amended complaint should not be immediately considered and granted.

The trial court entered the requested order to show cause and held a hearing on August 15, 2016. During the hearing, it was noted that a motion for summary disposition was pending with respect to the Township's claims and that counterclaims had been filed. The trial court made these remarks when it considered whether to grant the Township's request for immediate relief on its claims for declaratory and injunctive relief:

> In this instant matter, it is the latest incarnation of a long-standing, often contentious struggle over a sizeable gravel deposit[.]

* * *

-22-

Simply put, the condensed time frame by which these matters have come to this Court has not necessarily allowed sufficient time for meaningful response from either side, thereby placing this Court at a significant disadvantage. It would be imprudent for this Court to render any decision without the benefit of a full briefing of these issues at this time . . . . [This] in turn precludes this Court from being possessed of the necessary information to make the type of decision the litigants deserve, and the appellate courts for that matter. More than even the immediate parties, certainly, the citizens of the Township of Metamora and surrounding townships, who may be brought to bear the burden of this mining operation upon their streets and neighborhoods and within their homes, deserve a fully-informed decision just as much as those individuals and associations whose business interests are tied to development of a locally-sourced mining operation, and the long-term fiscal benefits that may be derived therein.

After noting that the Township had claimed that it would expend "upwards of $200,000" if it was to process and decide AAOM's application, the trial court noted that the Township had not provided an "explanation as to how these costs would be incurred[.]" Despite the Township's "unsubstantiated assertions," the trial court believed that it was necessary to enter a "status quo order" "to protect the positions and substantial rights of all the litigants" until their positions could be "fully develop[ed]" and ruled on by the trial court.

The trial court clarified that the order precluded the Township from processing and deciding AAOM's application.[9] The order was to remain in effect until the first summary disposition motions were heard on August 29, 2016. On August 29, 2016, however, the trial court stated that it was going to continue the status quo order. The trial court later entered an order on October 19, 2016, which provided:

[T]he Status Quo Order that was implemented and ordered by this Court on August 15, 2016, shall remain in place and continue until such time as the Plaintiff, Metamora Township's Complaint for Declaratory Action is heard and decided on the merits.

The record does not reflect that the October 19, 2016 order was ever set aside.

We conclude that the trial court's statements at the August 15, 2016 hearing reflect that the court contemplated whether the Township and counterplaintiffs could be harmed if the Township processed the mining application before the complex legal issues were resolved. Indeed, the Township and counterplaintiffs would have incurred significant expenses in addressing the need and serious consequences requirements, and these expenses could be wasted if the parties proceeded while the legal issues remained unsettled. Moreover, the trial court specifically considered whether harm to the public interest would result by referencing "the citizens of the Township of Metamora and surrounding townships[.]" Given the economic and environmental

---

[9] Although counterplaintiffs question whether the Township violated the order by adopting amended Article 12A, an order was never entered that prohibited the Township from amending the ordinance.

interests at stake, maintaining the status quo was a prudent course of action that ensured that the application would be processed by fully-informed parties. In this context, the trial court's ruling substantially satisfied the four requirements stated in *Detroit Fire Fighters Ass'n*, 482 Mich at 34.

Additionally, MCR 3.310 governs preliminary injunctions and temporary restraining orders. MCR 3.310(C) provides:

> **(C) Form and Scope of Injunction.** An order granting an injunction or restraining order
>
> (1) must set forth the reasons for its issuance;
>
> (2) must be specific in terms;
>
> (3) must describe in reasonable detail, and not by reference to the complaint or other document, the acts restrained; and
>
> (4) is binding only on the parties to the action, their officers, agents, servants, employees, and attorneys, and on those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

If the status quo order is properly categorized as an injunction, then the trial court's order here meets the requirements of the court rules. The trial court's failure to expressly address each requirement was harmless. The parties understood the requirements of the status quo order and the reasons for its issuance. It bound both parties. There was no confusion as to how the parties could comply with the order. "[A]n error or defect in anything done or omitted by the court or by the parties is not ground for . . . vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice." MCR 2.613(A). In this case, counterplaintiffs have not demonstrated how they were harmed by the trial court's failure to comply with MCR 3.310 in issuing the status quo order. Consequently, because we cannot conclude that the trial court's issuance of the order was inconsistent with substantial justice, counterplaintiffs are not entitled to relief.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Jane M. Beckering
/s/ Thomas C. Cameron

-24-